Haifa Saleh El HIMRI; Musab· El Himri, Petitioners,

v.

John ASHCROFT, Attorney General, Respondent.

No. 03–71152.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 2004.

Filed Aug. 2, 2004.

As Amended Aug. 24, 2004.

Matthew A. Carvalho, Heller, Ehrman, White & McAuliffe, Seattle, WA, for the petitioner.

Alicia D. Johnson and Leslie McKay, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for the respondent.

Before: HUG, TASHIMA, and PAEZ, Circuit Judges.

HUG, Circuit Judge:

This case requires us to look carefully at the methods the government uses to select a country of removal. The petitioners in this case are stateless Palestinians who fled Kuwait, the country of their nativity, when Iraq invaded Kuwait in 1991. They have been living in the United States since that time and now seek asylum, withholding of removal, and protection under the Convention Against Torture. The government argues that Jordan, rather than Kuwait, should be used as the country of removal because the petitioners hold Jordanian travel documents. The Immigration Judge ("IJ") accepted the government's argument in part and performed the legal analysis as to both Kuwait and Jordan, finding that the petitioners are removable to Jordan. We disagree. We hold that 8 U.S.C. § 1231 does not authorize the designation of Jordan as a country of removal in this case. We further hold that the El Himris have established that they are members of a minority that is subject to economic persecution in Kuwait, entitling them to withholding of removal.

## I. Background

### A. Immigration from Kuwait

Haifa El Himri was born in Kuwait to Palestinian parents who had fled to Kuwait as a result of the 1948 war between Israel and its Arab neighbors.[1] Until she came to the United States in 1990 she had lived most of her life in Kuwait. Because Kuwait does not grant citizenship to individuals not of Kuwaiti descent, El Himri is stateless. She does, however, have a Jordanian passport which entitles her to travel but does not confer Jordanian residency or nationality rights. In 1985 Haifa married Khaled El Himri, another stateless Palestinian living in Kuwait. Shortly thereafter they legally entered the United States when Khaled began college. While here Haifa had one child and became pregnant with her son Musab, who is also a party to this case.[2] Before Musab was born, Haifa returned to Kuwait to renew her residency. At the time, Kuwait required its non-citizen residents traveling abroad to renew their residency every two years or risk losing their residency privileges completely. While she was in Kuwait, Musab was born.

Khaled rejoined Haifa in Kuwait that summer but returned to the United States alone in May of 1990 to continue school; Haifa intended to follow later in the year. Her plan was accelerated in August of 1990 when Iraq invaded Kuwait. Haifa and all of her extended family in Kuwait fled. She drove a car through Iraq to Syria, where she boarded a plane to join her husband in the United States. Haifa and her son Musab entered the country on non-immigrant tourist visas. They overstayed their visas and continue to live in the United States.

After Kuwait was liberated from Iraq, the Kuwaiti government began a well-documented effort to reduce its non-citizen population. The Kuwaiti government did this by preventing its non-citizen residents who had fled during the war from returning and expelling those who had

---

1. The facts recounted are not disputed and were accepted as credible by the Immigration Judge. Because the facts were not disputed and were accepted as credible by the IJ, we accept as true here. *See Leiva–Montalvo v. INS*, 173 F.3d 749, 750 (9th Cir.1999).

2. The first child, who was born in the United States, is an American citizen. The El Himris since have had three other children born in the United States. The only child that is not an American citizen is Musab.

stayed. *See, e.g., Ouda v. INS*, 324 F.3d 445 (6th Cir.2003) (A Palestinian family living in Kuwait was told to leave by a certain date or they would be forcibly taken to the border.). It is undisputed that Kuwait embarked on this policy because it believed these non-citizens had supported Iraq during the war. Kuwait has been successful in reducing its Palestinian population from around 350,000 before the war to about 35,000 now.

In the period immediately after the war, Palestinians living in Kuwait were subject to extreme discrimination and persecution. According to an Amnesty International Report they were subject to extra-judicial executions, "disappearances," extended government detention, and torture. The more extreme persecution seems to have ended when constitutional government returned to Kuwait in 1993, although Palestinians living in Kuwait are still subject to extreme economic discrimination. Haifa El Himri further alleges that Palestinian women in Kuwait were and continue to be at high risk for rape, a claim that is supported by the State Department Country Report.

## B. Immigration Proceedings

Khaled El Himri, who is not a party to this case, filed an asylum petition in 1993 in response to removal proceedings begun by the INS.[3] Under the mistaken belief that Khaled's asylum claim applied to her and Musab as well, Haifa took no action. On January 20, 2000, the INS initiated removal proceedings against Haifa and Musab. Both conceded removability but petitioned for asylum, withholding of removal, and protection under the Convention Against Torture. Because Haifa had waited ten years to file her petition for

asylum, the IJ denied the petition for asylum as time-barred. He considered the merits of Musab's asylum petition, however, because he is a minor. The IJ denied Musab's petition for asylum on the merits and denied both Haifa's and Musab's petition for withholding of removal and protection under the Convention Against Torture.

The El Himris originally declined to state a country of removal and sought relief against removal to Kuwait. The government, however, urged that Jordan be considered the country of removal on the grounds that the petitioners have Jordanian travel documents. Without referencing the statute that governs removal, the IJ named both countries as countries of removal. The El Himris had an opportunity to seek relief against removal to Jordan, but they were unable to convince the IJ. He held that they were removable to Jordan and granted them voluntary departure. On appeal, the Board of Immigration Appeals ("BIA") adopted the IJ's opinion and reasoning, and granted the El Himris an additional thirty days within which to voluntarily depart. Last fall this court granted the El Himris' motion for a stay of voluntary departure and removal pending the resolution of this case. *See El Himri v. Ashcroft*, 344 F.3d 1261, 1263 (9th Cir.2003).

## II. Discussion

### A. Standard of Review

 Because the BIA adopted the IJ's decision without opinion, the IJ's decision is considered the final agency determination. *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir.2003). The IJ's decision to deny the El Himris' petitions

---

**3.** On March 1, 2003, the INS was reorganized as part of the Department of Homeland Security. 6 U.S.C. § 542. Because the events in this case took place before the reorganization, we refer to the INS.

for relief should be affirmed if it is supported by substantial evidence. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Wang v. Ashcroft,* 341 F.3d 1015, 1019–20 (9th Cir. 2003). The IJ's determination that the El Himris do not qualify for protection under the Convention Against Torture is reviewed for substantial evidence. *Zheng v. Ashcroft,* 332 F.3d 1186, 1193 (9th Cir. 2003).

■ We review the factual findings made by the IJ regarding the El Himris' ties to various potential countries of removal for substantial evidence. *See Monjaraz–Munoz v. INS,* 327 F.3d 892, 895 (9th Cir.2003), *amended by* 339 F.3d 1012(9th Cir.2003). However, we review the IJ's statutory interpretation *de novo. Id.; Kuhai v. INS,* 199 F.3d 909, 911–12 (7th Cir.1999).

## B. Kuwait

### 1. *Asylum*

We agree that Haifa El Himri's application for asylum is time-barred due to her failure to bring the claim within one year of arriving in the United States. 8 U.S.C. § 1158(a)(2)(B). As Musab El Himri is a minor, however, his asylum petition is not time-barred. We therefore consider the merits of his asylum claim. Because Musab El Himri's claim is derivative of his mother's we consider the merits of her claim only to the extent they form the basis of his claim.

■ To succeed on appeal, Musab El Himri must show that the evidence compels the conclusion that there is at least a ten percent chance that he will suffer persecution on account of his race, religion, nationality, social group, or political opinion if he were to return to Kuwait. *Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. 812;

*INS v. Cardoza–Fonseca,* 480 U.S. 421, 442, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

■ Musab El Himri cannot establish past persecution because he and his mother did not experience anything rising to the level of persecution before they left Kuwait. He is therefore not entitled to a presumption of a well-founded fear of future persecution, but he may independently establish a well-founded fear of future persecution. *Molina–Estrada v. INS,* 293 F.3d 1089, 1096 (9th Cir.2002).

■ Where persecution of a group of people is widespread within a country, an alien may establish an objectively reasonable fear of future persecution in that country by showing that, as a member of that group, he or she stands a heightened risk of persecution. *Hoxha v. Ashcroft,* 319 F.3d 1179, 1182–83 (9th Cir.2003). The greater the risk of persecution to group members, the lower the alien's burden to show a personal risk of persecution. *Id.*

■ Here, the IJ has accepted as credible evidence that Kuwait responded to the Gulf War by embarking on a systematic effort to decrease its population of non-Kuwaiti residents. Palestinians, in particular, were targeted for their imputed sympathy with Iraq during the invasion. Through forced expulsions, extreme persecution and discrimination, Kuwait decreased its Palestinian population from a pre-war total of 350,000 to a current population of about 35,000. Although the most extreme forms of persecution such as extra-judicial executions, "disappearances," extended government detention, and torture, seem to have ended with the return of constitutional government in 1993, Palestinians are still persecuted in Kuwait. Those who fled when Iraq invaded have not been allowed to return. After the war, Palestinians who remained in the country

were denied the right to work, go to school, or even obtain drinking water. *Ouda,* 324 F.3d at 448. According to the State Department Country Report, the government remains reluctant to issue work permits to the Palestinians still living in Kuwait. Non–Kuwaitis, especially those of targeted ethnicities, such as Palestinians, have a heightened risk of abuse by the police. State Dep't Country Report (1999) at A.R. 298, 313. As a Palestinian woman, Haifa El Himri testified credibly that she would have a high risk of rape if she were to return to Kuwait. In sum, according to the United Nations World Refugee Survey, Kuwait's policies toward its Palestinian residents "in effect mak[e] it impossible for them to continue living in Kuwait." United States Committee for Refugees, *World Refugee Survey 1995,* at A.R. 622.

The El Himris have carried their burden of showing they are members of a persecuted minority. Even if the El Himris were fortunate enough to avoid violent persecution upon their return to Kuwait, they would not be able to avoid the state-sponsored economic discrimination that has been enacted against Palestinians living in Kuwait since the end of the Gulf War. This court has held that extreme economic discrimination constitutes persecution. *Baballah v. Ashcroft,* 367 F.3d 1067, 1075–76 (9th Cir.2004). We have been particularly sensitive to state-sponsored economic discrimination as distinguished from isolated acts by individuals. *See Ghaly v. INS,* 58 F.3d 1425, 1431 (9th Cir.1995) (distinguishing the isolated discrimination in that case from the widespread, state-sanctioned economic discrimination that the BIA concluded constituted persecution in *Matter of Salama,* 11 I & N Dec. 536, 1966 WL 14294 (BIA 1966)).

Musab El Himri has established eligibility for asylum, which, if granted by the Attorney General, would entitle him to live in the United States and apply for permanent residence after one year. *INS v. Aguirre–Aguirre,* 526 U.S. 415, 419–20, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).

### 2. *Withholding of Removal*

 Both Haifa and Musab El Himri may bring claims for withholding of removal. There is no statutory time limit for bringing a petition for withholding of removal. 8 U.S.C. § 1231(b)(3). To qualify for withholding of removal, the El Himris must show that there is a clear probability that they will be persecuted if they return to Kuwait. *Hoxha,* 319 F.3d at 1184–85. This means that it must be more probable than not that they will suffer persecution if they returned to Kuwait. *Id.*

 The evidence in the record, which we relied upon to grant Musab El Himri's asylum claim, is sufficient to support both Haifa and Musab's claims for withholding of removal. The El Himris have shown that they are members of a persecuted minority. *See Hoxha,* 319 F.3d at 1182–83. As discussed in the analysis of Musab El Himri's asylum claim, Palestinians living in Kuwait are subject to severe economic discrimination. The El Himris' membership. in that minority makes it more likely than not that, if they returned to Kuwait they would suffer the same economic discrimination that has made life in Kuwait virtually impossible for their fellow Palestinians. The El Himris' burden to show a personalized risk of persecution is relatively low because Kuwait's policy of discriminating against its entire Palestinian population is well-established. The El Himris have carried their burden to show a "clear probability" that they would suffer economic persecution if they returned to Kuwait. Therefore, they are entitled to withholding of removal to Kuwait. This remedy is non-discretionary and protects

the El Himris from being removed to Kuwait, although it does not confer protection from removal to any other country. *Aguirre–Aguirre*, 526 U.S. at 419–20, 119 S.Ct. 1439; *Al–Harbi v. INS*, 242 F.3d 882, 888 (9th Cir.2001).

### 3. *Convention Against Torture*

▮ The petitioners do not qualify for protection under the Convention Against Torture. To qualify for protection under the Convention Against Torture, the El Himris must show that it is more likely than not that they will be tortured if returned to Kuwait. *Kamalthas v. I.N.S.*, 251 F.3d 1279, 1284 (9th Cir.2001). The torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Zheng*, 332 F.3d at 1194. The administrative record establishes that most of the physical violence perpetrated by the government against Palestinians ended when constitutional government returned to Kuwait. Therefore, the El Himris have not shown that it is more likely than not that they will suffer torture inflicted by the government if they return to Kuwait.

### C. Jordan

▮ The IJ erred when it designated Jordan, a country to which the petitioners have no ties except through their travel documents, as an alternate country of removal at the government's request. The government did not carry its burden of showing that Jordan would be willing to accept the petitioners. Without such proof, Jordan cannot be listed as an alternate country of removal for these petitioners.

The method by which the Attorney General may designate a country as the country for removal for any given alien is established in 8 U.S.C. § 1231(b). We have

jurisdiction to determine whether the government's designation of Jordan in this case complies with the statutory method. *See Ali v. Ashcroft*, 346 F.3d 873, 878–880 (9th Cir.2003); *Jama v. INS*, 329 F.3d 630, 632–33 (8th Cir.2003), *cert. granted*, —— U.S. ——, 124 S.Ct. 1407, 158 L.Ed.2d 76 (2004); *Kuhai*, 199 F.3d at 911–12.

As a preliminary matter, we note that the implementing regulations allow the IJ, acting on behalf of the Attorney General, to designate multiple countries of removal either in the alternative or in combination. 8 C.F.R. § 1240.12(c)("When removal is ordered the immigration judge shall specify the country, or countries in the alternate, to which respondent's removal shall be directed."). The petitioners do not contest this provision, and it is supported by the language of 8 U.S.C § 1231(b)(2)(E): "If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to *any* of the following countries." (emphasis added). Thus, as long as the countries designated by the IJ meet the requirements of § 1231, multiple countries may be designated for removal.

Section 1231(b)(2) establishes a three-step process for designating a country of removal for a removable alien who is living illegally in the United States. *See Ali*, 346 F.3d at 880. First, the alien is entitled to designate one country to which he or she would like to be removed. 8 U.S.C. § 1231(b)(2)(A). Because the El Himris refused to designate a country of removal, the Attorney General is authorized to remove them "to a country of which [they are] subject[s], national[s], or citizen[s] unless the government of that country . . . is not willing to accept the alien[s] into the country." 8 U.S.C. § 1231(b)(2)(D). The El Himris have never lived in Jordan. Their only tie to the country, their travel documents, explicitly does *not* confer resi-

dency rights. Therefore, the El Himris cannot be considered subjects, nationals, or citizens of Jordan.

Jordan may be designated as a country of removal, if at all, only through the application § 1231(b)(2)(E), the statutory provision for alternative countries of removal.[4] Subsection (E) lists seven potential alternate countries of removal:

(i) The country from which the alien *was admitted to* the United States.

(ii) The country in which is located the foreign port from which the alien entered the country from which the alien entered the United States.

(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

(iv) The country in which the alien was born.

(v) The country that had sovereignty over the alien's birthplace when the alien was born.

(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

Jordan may not be designated through clauses (iii)-(vi) of subsection E because the petitioners were both born in Kuwait. Similarly, because the petitioners fled Kuwait to Syria, and from there boarded the plane that brought them to the United States, Jordan may not be designated through clauses (i) or (ii). That leaves only clause (vii): "If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government *will accept* the alien into that country." (emphasis added).

Unlike clauses (I)-(vi), clause (vii) has an explicit requirement that the designated country be willing to accept the alien. We hold this to mean that, at the time the government proposes a country of removal pursuant to § 1231(b)(2)(E)(vii), the government must be able to show that the proposed country *will* accept the alien. In this case, the government has submitted no evidence that Jordan would be willing to accept the petitioners. The IJ's unrefuted and unobjected to statement of doubt that any country would receive the petitioners supports the conclusion that the government did not establish that Jordan would accept the petitioners before Jordan was named as a country of removal. Jordan was, therefore, improperly designated as a country of removal, and the El Himris may not be removed there.

---

4. The provisions for designating alternate countries of removal found in § 1231(b)(2)(E) have triggered a circuit split. Of the seven options, only the seventh explicitly requires the Attorney General to obtain the permission of the proposed country of removal before designating it as a country of removal. This court has held that the structure of the statute indicates an implicit requirement in each of the first six clauses of subsection (E) that the designated country be willing to accept the alien. *Ali*, 346 F.3d at 881–82. In similar circumstances, the Eighth Circuit held that the lack of an explicit requirement of acceptance indicates that any of the countries described in the first six clauses of subsection (E) may be designated as the country of removal, regardless of whether the country would be willing to accept the alien. *See Jama v. INS*, 329 F.3d 630, 633 (8th Cir. 2003), *cert. granted* —— U.S. ——, 124 S.Ct. 1407, 158 L.Ed.2d 76 (2004). The question that has triggered the circuit split does not concern us here, however, because this case turns on the seventh clause, which indisputably requires the Attorney General to prove that the proposed country of removal is willing to accept the alien.

940

## III. Conclusion

The El Himris have established that they are entitled to withholding of removal from Kuwait and that Musab El Himri qualifies for asylum from Kuwait. The El Himris are not entitled to protection under the Convention Against Torture. The El Himris may not be removed to Jordan because the IJ did not have the statutory authorization to designate Jordan as a country of removal. Because the IJ was not presented with positive evidence from the government that Jordan was willing to accept the petitioners, § 1231(b)(2)(E)(vii) bars the designation of Jordan as a country of removal.

For these reasons, the petition is **GRANTED.**