Rahewa **YEIMANE–BERHE,**
Petitioner,

v.

John **ASHCROFT, Attorney**
**General, Respondent.**

No. 03–71246.

United States Court of Appeals,
Ninth Circuit.

Submitted Sept. 1, 2004.*

Filed Dec. 23, 2004.

---

* This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Darío Aguirre, Aguirre & Cotman, San Diego, CA, for the petitioner.

Nancy E. Friedman, Civil Division, U.S. Department of Justice, Washington, DC, for the respondent.

Before REINHARDT, TASHIMA, and WARDLAW, Circuit Judges.

TASHIMA, Circuit Judge.

Rahewa Yeimane–Berhe, a native and citizen of Ethiopia, petitions for review of a decision of the Board of Immigration Appeals ("Board" or "BIA"), affirming a decision of the Immigration Judge ("IJ"), who denied her application for asylum, withholding of removal, and voluntary departure, and ordered her removed to Ethiopia. The IJ's decision was based on a finding that Yeimane–Berhe was not credible and did not have good moral character solely because she submitted a document that the IJ concluded was counterfeit. We have jurisdiction pursuant to 8 U.S.C. § 1252, and we grant the petition.

## BACKGROUND

Yeimane–Berhe is an Ethiopian of the Amhara ethnicity. In July 1992, when Yeimane–Berhe was a university student, she joined the All Amhara People's Organization ("AAPO"), which is a group dedicated to the prevention of human rights abuses committed by the Ethiopian government against people of the Amhara ethnicity. As a member of the group, Yeimane–Berhe distributed flyers, held recruiting meetings, wrote slogans for demonstrations, and participated in protests against the government.

The AAPO attempted to hold a demonstration in 1993, but the government would not allow it. The group therefore held a rally to protest this decision, and government soldiers began firing at them and beating them with sticks and rifle butts. Yeimane–Berhe was among a group of people who were arrested, taken to the police station, and detained for a month. Yeimane–Berhe testified that conditions during her detention were not good; they were fed only once a day and were not permitted to use restrooms. When she was released, she was warned not to participate in the AAPO or she would be detained "for good."

Yeimane–Berhe continued her involvement in the AAPO. Around June 1994, soldiers disrupted an AAPO meeting that Yeimane–Berhe was attending. The soldiers pointed guns at the members and called them "dirty Amharas" and traitors. Yeimane–Berhe was arrested and held for six months. She was interrogated and beaten by soldiers approximately four or five times during her six-month detention. The soldiers asked her about her involvement in the AAPO and asked her for the names of other students, but she refused to answer their questions, other than to admit that she was a member of the group.

One night during her detention, Yeimane–Berhe was taken to the interrogation room and raped by a colonel. He pointed his pistol at her and threatened to kill her "just like he killed [her] friend" if she did not stop screaming and struggling. Yeimane–Berhe became depressed after being raped and eventually realized that she was pregnant. She asked her sister to bring her pills that were used to treat stomach infections and overdosed on them in an attempt to commit suicide. She subsequently suffered a miscarriage and was hospitalized. Yeimane–Berhe submitted into evidence a medical certificate from the hospital that her sister had obtained for her.

To secure release from the hospital, Yeimane–Berhe needed someone to sign a paper taking responsibility for her, to ensure that she would not "run away." Yeimane–Berhe's father asked Yeimane–Berhe's "uncle," a family friend, to sign the document because the person who signed the paper needed to own a house or other asset.

After her release from the hospital, Yeimane–Berhe's father obtained a student visa for her to enter the United States and sent her to live here in early 1995. Yeimane–Berhe's sister, Solome, who also had been involved in the AAPO, came to the United States in 1997.[1] After Solome left Ethiopia, their father was questioned about Solome's whereabouts and ultimately was fired from his job.

In 1998, the Immigration and Naturalization Service ("INS")[2] issued a Notice to Appear to Yeimane–Berhe, charging her with removability. Yeimane–Berhe conceded removability, but filed an application for asylum, withholding of removal, and voluntary departure.

At the hearing to consider her application, Yeimane–Berhe testified that she would "certainly" be imprisoned and likely killed if returned to Ethiopia because she had not been released from the prison, she was accused of serious charges, and her friend who had been imprisoned with her had been killed. Yeimane–Berhe submitted into evidence a document, dated June 1995, from The Federal's First Honorable Court of the Ethiopian Federal Democratic Republic. The document stated that, because Yeimane–Berhe had been "in need of serious medical care," she had been bailed out of prison on December 25, 1994, and transferred to a hospital, but that she had failed to appear for subsequent court appointments. The court therefore ordered the bailer to pay the court the bail money and ordered Yeimane–Berhe arrested.

Yeimane–Berhe's sister, Solome, also testified at Yeimane–Berhe's hearing. Solome's testimony regarding the events that happened to her sister was entirely consistent with her sister's testimony.[3] As relevant to the IJ's credibility finding, Solome testified that she went to the hospital in

---

1. Solome was granted asylum in February 1998.

2. The INS has been abolished and its functions transferred to the Department of Homeland Security.See Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2142 (2002), 6 U.S.C. §§ 101–557. We will refer to the government agency as the INS.

3. For example, Solome testified that her sister was a member of the AAPO, had been impris-

oned twice, in the prison Yeimane–Berhe named, at the time Yeimane–Berhe stated. She also testified that Yeimane–Berhe was depressed at the end of 1994 and that Yeimane–Berhe asked her for medicine to treat stomach problems, so Solome brought her a medication called Vermox. Solome also stated that Yeimane–Berhe would be jailed and possibly killed if returned to Ethiopia because "they were looking for her when she left" and "[t]hey'd still be looking for her now."

1997 to get Yeimane–Berhe's medical certificate because Yeimane–Berhe asked her to get a document from the hospital verifying her treatment there. Solome also testified that the government did not allow her to visit Yeimane–Berhe while she was in the hospital because of Solome's involvement in the AAPO, but that she had no trouble obtaining the certificate later because the hospital did not know about her activities with the AAPO and because several years had passed since her sister had been released from the hospital.

The INS submitted a report from its Forensic Document Laboratory that stated that the medical certificate was "not what it claims to be." This conclusion was based on the following: (1) the " 'rubber stamp impression' " appeared to have been "carefully hand drawn" onto the page, "with multiple layers of ink creating a character or line," a feature that previously had been seen on counterfeit Ethiopian documents; and (2) the reproduction was poor, with excess toner that was "likely due to multiple generation copying."

The IJ relied on the INS's conclusion that the document was fraudulent to conclude that Yeimane–Berhe was not credible and that she accordingly had failed to establish that she was eligible for asylum. The IJ also thought it was unlikely that the hospital would have given Solome the document because the government did not allow her to visit Yeimane–Berhe during her stay in the hospital. Because the IJ concluded that Yeimane–Berhe was not eligible for asylum, she necessarily did not meet the more stringent standard of proof for withholding of removal. *See Guo v. Ashcroft*, 361 F.3d 1194, 1202 (9th Cir. 2004) (stating that, "[t]o establish eligibility for withholding of removal, an applicant

must meet 'a more stringent' standard of proof than is required for asylum") (quoting *Navas v. INS*, 217 F.3d 646, 655 (9th Cir.2000)). The IJ also denied voluntary departure on the basis that the submission of an allegedly counterfeit document precluded a finding that Yeimane–Berhe was a person of good moral character.[4] The IJ therefore ordered Yeimane–Berhe removed to Ethiopia.

On appeal, the Board stated that the IJ was in the best position to evaluate Yeimane–Berhe's credibility and therefore deferred to the IJ's credibility finding, agreeing that Yeimane–Berhe's submission of an allegedly fraudulent document supported the adverse credibility finding. The Board further reasoned that Yeimane–Berhe provided no explanation for the document and accordingly affirmed the IJ's decision. Yeimane–Berhe filed a timely petition for review.

## STANDARD OF REVIEW

"We generally review only the BIA's credibility decision, but when the BIA incorporates the IJ's decision as its own, we treat the IJ's reasons as the BIA's" *Wang He v. Ashcroft*, 328 F.3d 593, 595–96 (9th Cir.2003) (citations omitted). Adverse credibility determinations are reviewed under the deferential substantial evidence standard. *Singh v. Ashcroft*, 367 F.3d 1139, 1143 (9th Cir.2004). Nonetheless, the BIA and "the IJ must provide specific, cogent reasons for reaching an adverse credibility determination, and minor inconsistencies or factual omissions that do not go to the heart of the asylum claim are insufficient to support it." *Id.* (citation omitted). " '[S]peculation and conjecture cannot form the basis of an

---

4. In order to grant voluntary departure, the IJ must find that the alien, *inter alia*, has been "*a person of good moral character for at least 5*

*years* immediately preceding the alien's application for voluntary departure." 8 U.S.C. § 1229c(b)(1)(B).

adverse credibility finding, which must instead be based on substantial evidence.'" *Wenda Ge v. Ashcroft,* 367 F.3d 1121, 1124 (9th Cir.2004) (quoting *Shah v. INS,* 220 F.3d 1062, 1071 (9th Cir.2000)).

## DISCUSSION

The IJ's adverse credibility finding was based solely on the INS Forensic Document Laboratory's conclusion that the medical certificate submitted by Yeimane–Berhe was fraudulent. The IJ reasoned that Yeimane–Berhe was attempting to "bolster her asylum claim by the use of counterfeited documents," rendering her not credible. The BIA similarly relied on the allegedly fraudulent document in affirming the IJ's decision.

The medical certificate deemed fraudulent by the INS is a certificate from the hospital where Yeimane–Berhe testified that she was treated, dated December 25, 1994. The certificate states that Yeimane–Berhe had bruises on her back and parts of her feet (ascribed to the torture), was raped, and had overdosed on Vermox. The doctor recommended "long rest" and that Yeimane–Berhe "[m]ust not go back to prison."

 We have previously distinguished between fraudulent documents submitted, or statements made, to establish the critical elements of an asylum claim and those submitted or made in order to evade INS officials. *Akinmade v. INS,* 196 F.3d 951, 955–56 (9th Cir.1999). We held in Akinmade that the petitioner's use of fraudulent documents to gain entry into the United States could not serve as a basis for an adverse credibility determination because the documents did not relate to the heart of his asylum claim but rather were incidental to the claim. *Id.* at 956. It does not follow from this holding, however, that the converse is necessarily true—that is, that the use of one allegedly fraudulent document that may go to the heart of an asylum claim [5] automatically is determinative of an adverse credibility finding, especially when there is no indication or finding by the IJ that the petitioner knew the document was fraudulent. Although the use of a fraudulent document may, considering the totality of the record, lend support to an adverse credibility finding, Yeimane–Berhe's submission of an allegedly fraudulent document alone is not substantial evidence that she lacks credibility. Yeimane–Berhe's testimony was corroborated by other testimony and evidence, nothing else in the record suggests that she is not credible, and there is no evidence indicating that she knew the document was fraudulent. Thus, the IJ's adverse credibility determination is not supported by substantial evidence.

In *Kourski v. Ashcroft,* 355 F.3d 1038 (7th Cir.2004), the Seventh Circuit addressed a situation remarkably similar to that presented here. The petitioner in Kourski claimed that he had been persecuted in Russia by anti-Semites. The only evidence Kourski presented of his being Jewish was his own testimony and a copy of a birth certificate, which the INS determined to be a forgery. Kourski testified that his mother had sent him the docu-

---

**5.** Because the medical certificate refers to Yeimane–Berhe's torture and rape, it can be characterized as going to the heart of her asylum claim and that it was submitted in order to "establish the critical elements of the asylum claim." *Akinmade,* 196 F.3d at 956. On the other hand, it can be argued that the medical certificate does not go to the heart of Yeimane–Berhe's claim because it goes only to her suicide attempt and hospitalization, not her arrests and the mistreatment she suffered while imprisoned. For the purpose of our opinion, we assume that the certificate goes to the heart of Yeimane–Berhe's asylum claim.

ment and that he did not know it was a forgery. The IJ found Kourski not credible and denied his asylum application because he failed to rebut the INS's conclusion about the genuineness of the birth certificate. The IJ further noted that Kourski failed to present any other evidence to corroborate his " 'alleged Jewish nationality.' " *Id.*

The Seventh Circuit vacated the removal order. *Id.* at 1040. The court reasoned that the IJ could have believed Kourski's testimony in the absence of any corroboration because " 'the testimony of the applicant [for asylum], if credible, may be sufficient to sustain the burden of proof without corroboration.' " *Id.* at 1039 (quoting 8 C.F.R. § 208.13(a)) (alteration in original). The court characterized the IJ's conclusion that "the forgery showed that Kourski was not a credible witness" as "unsupportable because the immigration judge did not find that Kourski knew or suspected that the birth certificate was a forgery," and there was no evidence that he or his mother knew it was. *Id.* "And if they didn't know, the fact of forgery cannot be evidence against the credibility of his testimony that he is Jewish. The testimony is neither corroborated nor undermined by a forgery of which he had, so far as appears, no knowledge." *Id.* at 1039–40.

Similarly here, there is no evidence that Yeimane–Berhe knew or should have known that the medical certificate was counterfeit. The IJ and BIA assumed that Yeimane–Berhe knew the certificate was fraudulent. However, as in Kourski, Yeimane–Berhe testified that someone else, in this case her sister, obtained the certificate for her. Although the IJ was suspicious of Solome's ability to obtain the certificate from the hospital because of the government's refusal to allow her to visit Yeimane–Berhe there, Solome testified that

the hospital—as opposed to the government—did not know of her involvement in the AAPO, and that several years had passed since Yeimane–Berhe's release from the hospital.

Yeimane–Berhe presented testimony regarding the details of the basis for her asylum claim that was specific and detailed, not "vague" or "inconsistent in details relating to matters central to [her] claim." *Chebchoub v. INS*, 257 F.3d 1038, 1043 (9th Cir.2001) (internal quotations omitted). Her testimony "was not only internally consistent, but also comported with her asylum application and the documents she submitted as corroboration." *Shah*, 220 F.3d at 1072. The incidents she described, if she were deemed credible, certainly would establish eligibility for asylum. Thus, as the Seventh Circuit reasoned in Kourski, the IJ might have believed her, without presenting the medical certificate, and "on that basis have approved [her] application for asylum." *Kourski*, 355 F.3d at 1039.

Moreover, Yeimane–Berhe's testimony, unlike Kourski's, was corroborated by other evidence, further strengthening her claim. In Kourski, the only evidence that Kourski was Jewish was his own testimony. Here, Solome's testimony corroborated and was entirely consistent with her sister's testimony. Furthermore, the Ethiopian court document Yeimane–Berhe submitted states that she will be arrested if returned to Ethiopia. The INS did not question the authenticity of this court document. Thus, the evidence compels a finding that Yeimane–Berhe's testimony is credible.

Neither the INS nor the IJ impugned the authenticity of the Ethiopian court document, which states that Yeimane–Berhe "is to be arrested for her failures to appear in court in addition to the offences she has committed in the past." This evi-

dence provides support for Yeimane–Berhe's claim that she will be persecuted in the future. *See Knezevic v. Ashcroft,* 367 F.3d 1206, 1212 (9th Cir.2004) ("Even a ten percent chance that the applicant will be persecuted in the future is enough to establish a well-founded fear".). It also provides support for her argument that it is "more probable than not" that she will suffer persecution if returned to Ethiopia, meaning that she may be entitled to withholding of removal. *El Himri v. Ashcroft,* 378 F.3d 932, 937 (9th Cir.2004).

## CONCLUSION

There is no evidence that Yeimane–Berhe knew that the medical certificate, which was obtained by a third person, was fraudulent. Yeimane–Berhe's testimony was detailed, internally consistent, and consistent with the testimony of her sister and the documents she submitted into evidence. We conclude that the adverse credibility determination is not supported by substantial evidence and that Yeimane–Berhe's testimony is credible. For the foregoing reasons, the petition for review is granted and the case remanded for the IJ to consider Yeimane–Berhe's application, deeming her testimony to be credible.

**PETITION FOR REVIEW GRANTED.**