**Moses Musoke MUYENGA, Petitioner,**

v.

**Alberto R. GONZALES, Attorney General, Respondent.**

No. 03–71982.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 20, 2005.

Filed Jan. 5, 2006.

---

Estela Richeda, Law Offices of Estela S. Richeda, Pasadena, CA, for Petitioner.

Regional Counsel, Western Region Immigration & Naturalization Service, Laguna Niguel, CA, Ronald E. Lefevre, Chief Legal Officer, Office of the District Counsel Department of Homeland Security, San Francisco, CA, Terri J. Scadron, Esq., Rebecca Rohr, Esq., U.S. Department of Justice Civil Div./Office of Immigration Lit., Washington, DC, for Respondent.

Before PREGERSON, CLIFTON, and BYBEE, Circuit Judges.

## MEMORANDUM *

Moses Musoke Muyenga, a native of Uganda, applied for asylum and withholding of removal claiming past persecution for his political activities. He was active in the Uganda Young Democrats, the youth wing of an opposition party in Uganda, and worked at an orphanage for children of AIDS victims. He claims that he was arrested, detained for four days, and beaten by government officers who accused him of supporting a militant rebel faction, the Allied Democratic Front (ADF), through his work at the orphanage. At the end of his detention, guards allegedly put him in a room with snakes and demanded he either give information about ADF or join the army. Muyenga opted for army service and, after two weeks of training, escaped when his convoy was ambushed. Muyenga claims that he met up with a friend and fellow Uganda Young Democrats member, Damiano Kigove, who also worked at an orphanage and had escaped from similar incarceration and conscription. The two men made their way to Kampala and then to the United States, and Kigove (who has been granted asylum) testified on Muyenga's behalf. In support of his application, Muyenga submitted a letter dated August 15, 2000, documenting his affiliation with the Uganda Young Democrats and noting his disappearance "almost a year back." He also submitted an article from the Ugandan *People Newspaper* dated August 25, 1999 (about two weeks after his abduction) reporting that Muyenga had gone missing and was "suspected to have been abducted."

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3.

The Department of Homeland Security submitted the newspaper article to a forensic lab where experts determined it had been forged. The Immigration Judge agreed, noting that "[t]he problem is visible to the naked eye" because partially obscured print could be seen along the edges of the article, indicating it has been pasted onto the newspaper. The Immigration Judge held that the forged document undercut the credibility of Muyenga's story as a whole. He explained that in cases where he is not certain of credibility he "generally resolves these issues in favor of the respondents," but that in this case, the forged document dispelled any doubts as to Muyenga's lack of credibility. The BIA adopted the Immigration Judge's reasoning and affirmed the decision.

We review adverse credibility determinations under the deferential substantial evidence standard. *Singh v. Ashcroft,* 367 F.3d 1139, 1143 (9th Cir.2004). We find that there was substantial evidence to support the Immigration Judge's decision that Muyenga was not credible, and we cannot say that any reasonable adjudicator would be compelled to find otherwise. *See Desta v. Ashcroft,* 365 F.3d 741, 745 (9th Cir. 2004).

This case is readily distinguishable from *Yeimane–Berhe v. Ashcroft,* 393 F.3d 907, 913 (9th Cir.2004). In both cases, the petitioner submitted a forged document that went to the heart of the asylum case. *See Akinmade v. INS,* 196 F.3d 951, 955–56 (9th Cir.1999) (distinguishing forgeries "incidental" to an asylum claim from those that go to the "heart" of the claim, and noting that only the latter are relevant to credibility). In both, petitioners also presented additional documentation and one credible witness, and in neither case did the Immigration Judge find that the petitioner participated in the forgery. In this case, however, the evidence aside from the forged document does little to enhance petitioner's credibility. While "Yeimane–Berhe's testimony was detailed, internally consistent, and consistent with the testimony of her sister and the documents she submitted into evidence," *Yeimane–Berhe,* 393 F.3d at 913, Muyenga's was "somewhat halting," "not so inherently credible or consistent as to be certain he is telling the truth," and surprisingly similar to his friend Kigove's story. There were inconsistencies and contradictions in Muyenga's story, while in *Yeimane–Berhe* "nothing else in the record suggest[ed] that she [was] not credible." *Id.* at 911. While the forgery in Muyenga's case was the decisive factor in the adverse credibility ruling, it was not the only evidence that suggested he was not credible. The Immigration Judge noted that the newspaper article was "the one piece of evidence that would make [Muyenga's] story completely unassailable," indicating that the other evidence as a whole was not strong enough to outweigh the forged document in his credibility determination.

Muyenga's only witness, Kigove, did not observe Muyenga's alleged capture and mistreatment, unlike *Yeimane–Berhe's* witness, who brought *Yeimane–Berhe* medicine while she was in prison and observed that government officials "were looking for her" when she left Ethiopia. *Id.* at 909 n. 3. The Immigration Judge questioned the value of Kigove's testimony, noting that the two men's accounts were strangely similar, suggesting that they had "decided to make up a story and stick to it."

In addition to the forged document, Yeimane–Berhe provided additional documentation that established both past persecution and a well-founded fear of future persecution. She submitted an Ethiopian court document explaining that she had been released from prison in order to re-

ceive medical care, had subsequently failed to appear, and had forfeited bail. The court then ordered her arrest. *Id.* at 909. In contrast, the letter Muyenga provided from the Uganda Young Democrats merely described his disappearance and speculated about its cause. The letter was dated more than a year after his disappearance and postdated his arrival in the United States by nearly eleven months. The document does not establish either past persecution or fear of future persecution, because the disappearance it describes could have been Muyenga's recent immigration to this country. An asylum applicant need not present corroborating evidence, but "if the trier of fact either does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal to his asylum application." *Sidhu v. INS,* 220 F.3d 1085, 1090 (9th Cir.2000).

Perhaps the most troubling flaw in Muyenga's case, however, goes to the forgery itself. Muyenga gives inexplicably contradictory accounts of how he acquired the article. In his August 11, 2000 testimony before the Immigration Judge, Muyenga reported that a woman named Grace knocked on his door and gave him the article, explaining that it was from Muyenga's uncle. Muyenga later called his uncle, who confirmed the story. Yet in his June 19, 2001 testimony, Muyenga said that he found the article at home with his roommate, who told him that a woman had dropped it off while he was away. When he called his uncle to ask about the article, he was told his uncle had died. This strange inconsistency in Muyenga's testimony suggests that his description of its origins is not credible. The contradiction alone provides substantial evidence to support the Immigration Judge's adverse credibility ruling and denial of the petition for asylum. Because the forgery is accom-

panied by testimonial inconsistencies, this case is more like *Desta v. Ashcroft* than *Yeimane–Berhe.* In *Desta,* we upheld the Immigration Judge's adverse credibility ruling where documents submitted by petitioner "may have been fraudulent," because Desta's testimony contained material inconsistencies that further compromised his credibility. 365 F.3d at 745; *see also Chebchoub v. INS,* 257 F.3d 1038, 1043 (9th Cir.2001) (noting that "only one inconsistency can be sufficient" to affirm an adverse credibility ruling). Accordingly, the petition is DENIED.

PREGERSON, Circuit Judge, dissenting:

I dissent. I disagree with the majority's conclusion that *Yeimane–Berhe v. Ashcroft,* 393 F.3d 907 (9th Cir.2004), does not apply to the instant case. Because I believe that the principles underlying *Yeimane–Berhe* control this case, I conclude that the Immigration Judge ("IJ") improperly based his adverse credibility determination on the single fraudulent document submitted by the petitioner.

In *Yeimane–Berhe,* this court held that a single fraudulent document that goes to the heart of an asylum claim does not necessarily warrant an adverse credibility finding. *See Yeimane–Berhe,* 393 F.3d at 911. This is especially true "when there is no indication or finding by the IJ that the petitioner knew the document was fraudulent." *Id.* Therefore, while such a document may support an adverse credibility determination, it is not sufficient evidence, standing alone, that the petitioner lacks credibility. *See id.*

*Yeimane–Berhe* is persuasive here. There is little evidence that Muyenga "knew or should have known that the [newspaper article] was counterfeit." *See Yeimane–Berhe,* 393 F.3d at 912. Indeed,

the IJ never concluded, nor does the record suggest, that Muyenga knew the newspaper article was fake.[1] The IJ stated, "[T]he only thing I know about the case is that there is fraudulent evidence in there, therefore, I find the respondent not to be credible." It was the document itself, and not Muyenga's knowledge of its fraudulence, that served as the sole basis for the IJ's adverse credibility determination. Applying *Yeimane–Berhe*, Muyenga's testimony should have been viewed as credible by the IJ.

The majority claims that *Yeimane–Berhe* is distinguishable from this case. I disagree. First, the majority states that in *Yeimane–Berhe*, the petitioner's witness visited her in prison and knew that Ethiopian government officials were looking for the petitioner. The majority goes on to say that in this case, Muyenga's witness, Damiano Kigove, "did not observe [Muyenga's] alleged capture and mistreatment." It is simply incorrect to imply that Kigove did not observe any of the persecution suffered by Muyenga. The two men found each other while they were hiding in the jungle; both were trying to flee from the same military captors. They hid together in the bushes for a day while soldiers searched for them. Together they escaped on foot to a nearby village. The allegation that Kigove had no personal knowledge of Muyenga's persecution has no basis in fact.[2]

Second, the majority states that in *Yeimane–Berhe*, the petitioner provided additional documents that helped to prove that the petitioner was persecuted. The majority contrasts the documentary evidence in *Yeimane–Berhe* with a letter Muyenga submitted as evidence. The letter, written by an official of the Uganda Young Democrats, provided additional corroboration for some of Muyenga's testimony. The majority essentially holds that this letter, unlike the additional evidence in *Yeimane–Berhe*, does little to enhance Muyenga's claim of persecution. But it is unnecessary to evaluate the relative strength or weakness of merely corroborative evidence. As the majority concedes, an applicant for asylum need not submit corroborating evidence. "Because asylum cases are inherently difficult to prove, an applicant may establish his case through his own testimony alone." *Garrovillas v. INS*, 156 F.3d 1010, 1016–17 (9th Cir.1998); *see also* 8 C.F.R. § 1208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). Because Muyenga's testimony regarding persecution was consistent in "details relating to matters central to [his] claim." *Yeimane–Berhe*, 393 F.3d at 912. The IJ could have based a finding of past persecution on his testimony alone.

Additionally, the majority points out that the IJ stated that Muyenga's story was "not so inherently credible or consistent as to be certain he is telling the truth," and that the newspaper article was "the one piece of evidence that would make [Muyenga's] story completely unassailable." The majority, however, omits a key concession by the IJ. After the IJ stated

---

1. At the hearing, Muyenga testified that when he first saw the article, he was suspicious; he acknowledged that he could see the different typefaces on the document. Muyenga explained, however, that in Uganda, stopping the presses and superimposing breaking news stories into newspapers is a common practice.

2. The IJ speculated that the similarities between Muyenga's and Kigove's accounts suggested that the two men had "decided to make up a story and stick to it." The similarities in their stories, however, is not surprising because Muyenga and Kigove were kidnapped by the same military group. The two men had similar accounts because they went through the same experience.

that Muyenga's testimony was "not so inherently credible as to be certain he is telling the truth," he went on to concede that, absent the fraudulent article, he was willing to give Muyenga "the benefit of the doubt" because there was no other reason to question his credibility. This suggests, then, that Muyenga *was* credible. Moreover, "complete unassailability" is not the standard for credibility in immigration court. It is well settled in this circuit that "an alien's testimony, if unrefuted and credible, direct and specific, is sufficient to establish the facts testified without corroboration." *Kaur v. Ashcroft*, 379 F.3d 876, 890 (9th Cir.2004).

According to the majority, the "most troubling flaw" in Muyenga's case is the conflicting testimony he gave regarding how he came to possess the newspaper article. At one hearing, Muyenga said that he was present when the article was brought to his apartment. In a later hearing, he stated that he was not. This discrepancy is overemphasized by the majority.[3] The IJ did not think that this contradiction was worthy of discussion in his oral decision. The BIA also did not address the issue after its own review of the record. I believe the inconsistent testimony is simply not a significant matter on this review of the IJ's adverse credibility determination.

In sum, although Muyenga submitted a fraudulent document, he did not know or have reason to know that the document was falsified. Contrary to the majority's belief, there was no other reasonable basis for the IJ to conclude that Muyenga was

not credible. Thus, under *Yeimane–Berhe*, it was improper for the IJ to base his adverse credibility determination on a single fraudulent document. Accordingly, I dissent.

---

**3.** The majority draws a parallel between this case and *Desta v. Ashcroft,* 365 F.3d 741 (9th Cir.2004). That comparison is improper. In *Desta,* several fraudulent documents were accompanied by inconsistent testimony regarding the extent of the petitioner's injuries and the circumstances of an alleged rape. *See Desta,* 365 F.3d at 745. This court upheld the IJ's adverse credibility finding. *See id.* It is plain that in *Desta,* the problematic testimony related to subjects that went to the heart of the petitioner's claim. Here, the testimonial inconsistency related *only* to the fraudulent document, and *not* to the basic facts of Muyenga's asylum application.