**Insa DABO, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

**No. 03–3422.**

United States Court of Appeals, Sixth Circuit.

Aug. 13, 2004.

John S. Richbourg, Memphis, TN, for Petitioner.

Lyle D. Jentzer, U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: BATCHELDER and DAUGHTREY, Circuit Judges; and

**514**

DOWD, District Judge.*

### ORDER

Insa Dabo, a citizen of Senegal currently residing in Tennessee, petitions through counsel for review of an order of the Board of Immigration Appeals affirming an immigration judge's decision denying his requests for asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT). Counsel did not respond to a request to show cause why oral argument would be necessary in this case, and this panel unanimously agrees that oral argument is not needed. Fed. R.App. P. 34(a).

Dabo was born in Senegal in 1967. He entered the United States in 1991 using false papers. He was placed in removal proceedings, during which he requested the above relief. At the first hearing before an immigration judge (IJ), Dabo was unable to communicate through the Fulani translator. A second hearing was held with a Wolof translator, Dabo's second language. Dabo testified that he lived in the southern part of Senegal in an area known as the Casamance. An insurgent group, the Democratic Forces of Casamance Movement, has long been fighting for independence of the Casamance from Senegal. Dabo testified that he and his family were not members of the Diola tribe to which most members of the Movement belong, but were Mandingos who were not in favor of separation of the Casamance from Senegal. The guerilla group attempted to recruit Dabo to join them, but he refused, following which they threatened to kill him and his family. At the end of 1990, many members of the guerilla group attacked Dabo's family home, killing his parents and younger sister. While describing how his mother was killed in front of his eyes, Dabo became so distraught that the IJ continued the hearing to a third occasion. At the third hearing, Dabo continued his testimony, relating how the rebels took him from his home into the bush, saying they would kill him for being a traitor. They beat him severely and left him for dead, but he survived. Three days later, an old man on a bicycle helped him get to the hospital, where he stayed for two weeks recovering from the beating. His former teacher then smuggled him into Gambia by telling police at checkpoints that Dabo was his son. Dabo testified that he saw his name on a list held by the police of people to arrest, and believed that the rebels had provided disinformation to the police that he was one of them, a common tactic designed to force recruits to join them. A friend of Dabo's also testified that his brother was in the police, and had confirmed that there was an arrest warrant pending for Dabo on suspicion of belonging to the rebels. In Gambia, Dabo stole a passport from a businessman and substituted his photo inside, which he used to come to the United States.

Forensic document examiners also testified for both the government and Dabo regarding documents submitted in support of the claim. The government's expert testified that Dabo's Senegal identification document was genuine, but that the other documents appeared to be falsified. His hospital discharge paper was discounted by the government's expert because it had been printed on a high speed printer, which was unusual for Senegal. Dabo testified that the hospital had a stack of such forms, which the discharge office filled in by hand with his information. The three death certificates of Dabo's family were

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

questioned by the government's expert because they appeared to have been rubbed on a dirty surface in an attempt to artificially age them. Dabo testified that the documents had been damaged when the ceiling of his apartment collapsed and they were thrown out in the clean up and then retrieved from the trash. However, he did not present affidavits from his landlord or roommate to confirm this story. The warrant for Dabo's arrest was questioned by the government's expert because the heading was not in alignment with the body of the text, showing that it had been taken out of a typewriter and then reinserted. Dabo presented a rather unbelievable story of how he came by this document, claiming that a friend had asked to have it when he saw it posted at the police station. Dabo's expert testified that it was not possible to state affirmatively that documents had been purposely artificially aged, as implied by the government's expert.

The IJ issued a written opinion in which he concluded that the documents in support of Dabo's claim were questionable, but not demonstrably false. He concluded that he would have granted relief based on past persecution and a well-founded fear of future persecution due to imputed political opinion but for the apparently falsified documents. He stated that Dabo's uncorroborated testimony was insufficient to grant relief. He denied the requests for asylum, withholding, and relief under the CAT, but granted Dabo voluntary departure because the documents were not demonstrably counterfeit. Dabo appealed to the Board of Immigration Appeals (BIA). A panel of the BIA affirmed the IJ's decision, agreeing that the documents were questionable, and adding that Dabo also had not established persecution by the rebels on a protected ground, or that he could not avoid persecution by the rebel group by relocating outside Casamance, and that he had not established fear of persecution by the government on a protected ground.

In his brief before the court, Dabo argues that the BIA erred in its credibility finding, and in its conclusion that his persecution was not related to his social group and political opinion.

▪ A decision of the BIA is reviewed to determine whether it is supported by substantial evidence. *Lwin v. INS,* 144 F.3d 505, 508 (7th Cir.1998). An adverse credibility finding, which was the main reason for denying relief in this case, must be upheld where there is a legitimate articulable basis for questioning an applicant's credibility. *Osorio v. INS,* 99 F.3d 928, 931 (9th Cir.1996). The presentation of fraudulent documents indicates an overall lack of credibility by an applicant. *Akinmade v. INS,* 196 F.3d 951, 955–56 (9th Cir.1999). Therefore, we find that the adverse credibility finding in this case is supported by substantial evidence.

▪ The BIA also properly found, in reliance on *INS v. Elias–Zacarias,* 502 U.S. 478, 482–83, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), that forced recruitment by a guerilla group is not a basis for asylum, and that Dabo could avoid persecution by the rebels in other areas of Senegal. Finally, the BIA did not believe that Dabo had established a fear of future persecution by the government of Senegal, where the arrest warrant he submitted in support of this argument was apparently fraudulent, and Dabo does not hold any political opinion threatening to the government of Senegal.

Dabo also failed to establish that he was entitled to relief under the CAT, *see Selimi v. Ashcroft,* 360 F.3d 736, 741 (7th Cir.2004), or to withholding of removal. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 425, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

Accordingly, the petition for review is denied.