*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0395p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ABEDIN SELAMI, DONALD SELAMI,

*Petitioners,*

*v.*

No. 03-4391

ALBERTO GONZALES, United States Attorney
General,

*Respondent.*

---

On Petition for Review of an Order of the Board
of Immigration Appeals.
Nos. A78 640 810; A78 640 812.

Submitted: February 1, 2005

Decided and Filed: September 16, 2005

Before: DAUGHTREY, MOORE, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ON BRIEF:** David C. Koelsch, FREEDOM HOUSE, Detroit, Michigan, for Petitioners. Stacy S. Paddack, Terri J. Scadron, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Petitioners, Abedin Selami ("Selami") and his son, Donald Selami, seek review of a final order of the Board of Immigration Appeals ("BIA") affirming the decision of the Immigration Judge ("IJ") to deny their request for asylum and withholding of removal under the Immigration and Nationality Act ("INA"). The IJ found that Selami was not credible because he submitted a fraudulent newspaper article in support of his asylum claim, and therefore the IJ denied his application. Furthermore, in light of the fraudulent article, the IJ found that Selami's asylum application was frivolous. In his petition for review, Selami challenges these findings. Upon review, we conclude that both of the IJ's findings were supported by substantial evidence in the record, and therefore we **DENY** the petition for review.

1

# I. BACKGROUND

Selami is a thirty-eight-year-old native and citizen of Albania. He entered the United States in May 2000 along with his wife, Esmeralda Selami, and son, Donald Selami (collectively, the "Selamis"), using false Italian passports. On June 15, 2000, Selami filed an asylum application on the grounds that he suffered past political persecution in Albania and had a well-founded fear of future persecution should he return.[1]

Specifically, Selami claims that his family had a long history of anti-communist activity and consequently were interned in the Dranije labor camp, where he was born in 1966. He asserts that his father was jailed by the Communists in 1970 for his political activities. Furthermore, he claims that he was jailed for thirty days in June 1990 because he tried to flee the country. Selami states that while in jail, he was often beaten and starved by the Communists.

Selami's involvement with the Democratic Party in Albania began in 1991 when he helped found a party chapter in his home town of Ballsh. Selami served as a member of the chapter's steering committee and as a party instructor. Selami claims that because of his participation in the Democratic Party he continued to be persecuted. Specifically, he alleges that in April 1991 he was arrested by the police for demonstrating against the Socialist Party. He claims that he was jailed for three days, during which he was beaten and starved.

Following the election of the Democratic Party, Selami enjoyed a period of relative calm. In 1993, he was appointed to the position of general manager of the telecommunications office in Ballsh. In 1997, following the collapse of the pyramid schemes, the Democratic Party was swept out of power and replaced by the Socialists. Selami alleges that in June 1997, a week before the election which brought the Socialist Party to power, a group of armed, masked men entered the telecommunications building shouting his name and firing shots in the air. He claims that he managed to escape harm by quickly running out a side exit. After the election, Selami was fired from his appointed position at the telecom company and took a job as a propaganda instructor for the Democratic Party.

Selami alleges that throughout the fall of 1997, the leaders of the Democratic Party were frequently attacked. Selami contends that during this time, he was targeted by former communists. Selami alleges that in October 1997, he was sitting next to his cousin in a coffee shop when "armed left extremists" began firing at him, but mistakenly killed his cousin instead. Joint Appendix ("J.A.") at 174 (June 15, 2000 Asylum Application at 12). Selami also contends that he was arrested following his participation in an anti-government demonstration to protest the assassination of Azem Harjdari, a Democratic Party leader. Selami alleges that he was held for seven days in jail during which time he was beaten and tortured.

Finally, Selami states that in April 2000, he and three other Democratic Party leaders were sitting in a coffee shop when the police chief and five to six other armed, masked officers arrived. Selami alleges that the police chief stated that they had come for him. Selami claims that he ran out a back door while the police chased and shot at him. He contends that he hid in a friend's house, was later joined by his wife and son, and remained in hiding for several weeks. Ultimately, the Selamis fled to the United States.

The IJ conducted a hearing on the merits of Selami's asylum application on May 10, 2001 and September 11, 2001. On the first day of the hearing, Selami attempted to submit into evidence

---

[1]Abedin Selami is the principal asylum applicant, and his wife and son are derivative applicants who rely on his application. *See* 8 U.S.C. § 1158(b)(3)(A). Though her asylum claim is derivative to that of her husband, Esmeralda Selami separately appealed from the BIA's decision to this court and therefore is not a party to this appeal.

a newspaper article to corroborate his claims of persecution. Selami asserts that his father in Albania sent him the newspaper article. The newspaper, *Liria*, which means freedom, is published by the "Formerly Persecuted Society of Albania." J.A. at 323 (Removal Hr'g Tr. at 124). The title of the article, which supposedly appeared in the March 30, 2001 issue of the newspaper, was "Anti-Communists Leave the Country." J.A. at 44 (Newspaper Translation). The translation of the article provided by Selami states:

> Since the Neo-Communists came into power in 1997 using armed force and the help of foreign spies who never liked Albania and who continuously and systemically use force and terror typical of Communists, many Albanian anti-Communists have been arrested, tortured and killed without due process. In this criminal situation, many Anti-Communists hoping to avoid the Neo-Communist force have had to leave their country and their family and travel far from their loved ones.

> One of them is Abedin Selami from the City of Ballsh where the oppressions of the Neo-Communists are powerful and where the threats happened often and forced Abedin to emigrate with his wife and child. His obligation for his family is a natural human instinct and to escape the pressure of the Neo-Communists he had to emigrate with hope that one day democracy in Albania will triumph and one day he will come back and will give his contribution which he had to interrupt to escape the Red Terror.

J.A. at 44 (Newspaper Translation). Upon review of the article, the IJ noted that the format of the article was "quite different than the type in the rest of the newspaper, as is the column spacing and the . . . manner in which it's spaced, as opposed to the pictures and other spacing in the rest of the paper." J.A. at 324 (Removal Hr'g Tr. at 125). Because of her suspicions regarding the authenticity of the article, the IJ did not admit the article into evidence, but instead sent a request to the Library of Congress to verify the accuracy of the article.

On September 11, 2001, the IJ reconvened Selami's hearing and reported that the Library of Congress had obtained a copy of the March 30, 2001 issue of *Liria* from the National Library of Albania, and that the article which actually appeared was not the one which Selami had submitted. The actual article which appeared in the newspaper that day was titled, "the right wing will be unified under the flag stepped by celebration." J.A. at 371 (Removal Hr'g Tr. at 172). Thus, the IJ concluded that the submitted article was fraudulent and "cast[] [Selami's] entire testimony and evidence in this case in doubt." J.A. at 374 (Removal Hr'g Tr. at 175). The IJ asked Selami if there was any evidence he would like to present to rebut the allegation that the article was fraudulent, but he declined the IJ's invitation.

On March 29, 2002, based largely upon the submission of the fraudulent newspaper article, the IJ denied Selami's asylum application. Moreover, the IJ found his asylum application to be frivolous pursuant to § 208(d)(6) of the INA, 8 U.S.C. § 1158(d)(6). On October 15, 2003, the BIA affirmed the IJ's decision without opinion pursuant to 8 C.F.R. § 1003.1(e)(4). Selami now petitions this court for review.

## II. ANALYSIS

### A. Adverse Credibility Determination

The first argument that Selami raises in his petition is that the IJ erred in finding him to be incredible. While ordinarily our review is limited to the actions taken by the BIA, "[w]hen the Board adopts the decision of the IJ in lieu of issuing its own opinion, we review the IJ's decision as the final agency decision." *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003). Furthermore, we have

stated that "[c]redibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Under that standard, findings of fact are treated as "'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). Applying this deferential standard to Selami's case, we conclude that the IJ's credibility finding was supported by the evidence, and therefore the record does not compel a contrary result.

Under the INA, the Attorney General may grant asylum to an alien who qualifies as a "refugee," which is defined as one "who is unable or unwilling to return to . . . [his or her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A). An applicant for asylum bears the burden of demonstrating that "persecution is a reasonable possibility should he be returned to his country of origin." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (internal quotation omitted). The applicant need not demonstrate that he will probably be persecuted if returned because "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a).

In this case, by contrast, Selami offered a fraudulent newspaper article as corroborating evidence of his claims of past persecution and a well-founded fear of future persecution should he return. We have held repeatedly in unpublished decisions of this court that the submission of a fraudulent document in support of a key element of an asylum claim is sufficient to support an adverse credibility determination. *See Lacinaj v. Ashcroft*, No. 03-4003, 2005 WL 1313019, at *8 (6th Cir. May 27, 2005); *Kasa v. Gonzales*, No. 03-4318, 2005 WL 486766, at *3 (6th Cir. Mar. 2, 2005); *Gjinaj v. Ashcroft*, No. 03-3560, 2005 WL 54730, at *3 (6th Cir. Jan. 6, 2005); *Dabo v. Ashcroft*, No. 03-3422, 2004 WL 1870440, at *2 (6th Cir. Aug. 13, 2004). This principle has been similarly upheld by other courts of appeals as well. *See, e.g., Yongo v. INS*, 355 F.3d 27, 33 (1st Cir. 2004); *Akinmade v. INS*, 196 F.3d 951, 956 (9th Cir. 1999). As the BIA has explained, the presentation of a fraudulent document "to prove a central element of the claim in an asylum adjudication . . . in the absence of an explanation regarding such presentation[] creates serious doubts regarding the [applicant's] overall credibility." *In re O-D-*, 21 I. & N. Dec. 1079, 1083 (BIA 1998). The BIA concluded that "[s]uch fraud tarnishes [the applicant's] veracity and diminishes the reliability of his other evidence." *Id.* We agree with the BIA's reasoning.

In his petition to this court, Selami does not dispute the fraudulent nature of the newspaper article he submitted, but instead argues that the article did not involve the heart of his asylum claim. We find this argument to be wholly without merit. The article specifically states that Selami is a prominent anti-communist activist in Ballsh who was forced to flee the country with his family because of the threats from the Neo-Communists. The article concludes by suggesting that he hopes to return when democracy is restored. The sole reason for submitting the article to the IJ was to corroborate Selami's claims that he suffered past persecution because of his political activities and that he had a well-founded fear of future persecution should he return — which are the essential elements of his asylum claim.

Selami also argues that the fraudulent article should not be used in an adverse credibility determination against him because the article was sent to him by his father and he was unaware of its fraudulent nature. We find this argument to be equally unpersuasive. The Seventh Circuit has explained, "if the applicant has no reason to know that the document is forged, its existence does not undermine his credibility, though it deprives his testimony of the extra boost to credibility that it would have if it were corroborated." *Kourski v. Ashcroft*, 355 F.3d 1038, 1040 (7th Cir. 2004); *see also Yeimane-Berhe v. Ashcroft*, 393 F.3d 907, 912 (9th Cir. 2004). In *Kourski*, however, the

fraudulent document was a birth certificate which was "a subtle forgery, which is why the board devoted most of its opinion to satisfying itself that it really *was* a forgery, and so it might well have fooled [the applicant] and his mother." *Kourski*, 355 F.3d at 1040. By contrast, in this case, the forgery is readily apparent from a comparison of the forged article with the other article appearing on the page submitted. There are obvious differences between the articles' typeface, spacing, and capitalization, which gave rise to the IJ's suspicions after only a brief review. Moreover, Selami does not explain why he did not question his father about the article's authenticity during the four months in which the Library of Congress investigated. Lastly, when asked at the reconvened hearing to rebut the charge that the article was fraudulent, Selami never stated that he lacked knowledge of the forgery. Indeed, Selami uttered absolutely no explanation. Thus, in light of the obvious nature of the forgery, we conclude that Selami's argument is without merit.

In sum, we conclude that the fraudulent newspaper article is sufficient to support the IJ's adverse credibility determination. Accordingly, the IJ did not err in denying Selami's request for asylum.

## B. Frivolousness Finding

Selami next challenges the IJ's finding that his asylum application was frivolous. Upon review, we conclude that the IJ's finding was supported by substantial evidence in the record.

Under the INA, if the IJ determines that an alien has filed a frivolous application, the alien becomes "permanently ineligible for any benefits under this chapter." 8 U.S.C. § 1158(d)(6). "[A]n asylum application is frivolous if any of its material elements is deliberately fabricated." 8 C.F.R. § 1208.20. The regulations require, however, that the applicant "has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim." *Id.*

In this case, it is undisputed that the newspaper article submitted to the IJ was fraudulent. Moreover, as we stated above, the article was submitted by Selami to corroborate the core elements of his asylum claim. After finding that the document was fabricated, the IJ gave Selami an opportunity to explain, but he failed to provide any answers notwithstanding notice of the IJ's doubts four months earlier. In his brief to this court, Selami argues that his application should not be deemed frivolous because he did not have knowledge of the fraud. As we stated above, in light of the obvious nature of the forgery, and Selami's failure to articulate any explanation to the IJ, Selami's argument is without merit. Accordingly, we conclude that substantial evidence in the record supports the IJ's finding that Selami's application was frivolous.[2]

### III. CONCLUSION

For the foregoing reasons, we conclude that none of the arguments presented by Selami are persuasive, and therefore we **DENY** Selami's petition for review.

---

[2] Selami argues that even if the IJ did not err in finding his application to be frivolous, he should be still entitled to withholding of removal. We find this argument to be unpersuasive as well. Selami was not denied withholding of removal because the IJ determined that his application was frivolous. Instead, the IJ found that Selami was not credible, and therefore could not demonstrate that he suffered past persecution or a well-founded fear of persecution for purposes of his asylum claim. "An applicant seeking withholding of removal faces a more stringent burden than what is required on a claim for asylum." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004). Because Selami failed to establish his eligibility for asylum, "it therefore follows that he cannot satisfy the more stringent standard for withholding of [removal]" as well. *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001).