**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0702n.06
Filed: September 28, 2006

**No. 04-4111**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| MAMADOU SY, | ) |
| | ) |
| Petitioner, | ) |
| | ) ON PETITION FOR REVIEW FROM |
| v. | ) A DECISION OF THE BOARD OF |
| | ) IMMIGRATION APPEALS |
| ALBERTO GONZALES, Attorney General, | ) |
| | ) |
| Respondent. | ) |

Before: DAUGHTREY and COLE, Circuit Judges, and BERTELSMAN,[*] District Judge.

**PER CURIAM.** The petitioner, Mamadou Sy, appeals from the final order of removal issued against him by the immigration court. He was initially granted asylum by an immigration judge in December 1999. Shortly thereafter, the Immigration and Nationality Service (INS) (today reconstituted as the U.S. Immigration and Customs Enforcement agency) moved to terminate the grant of asylum and reopen removal proceedings against Sy. The basis for the motion was a report from the INS's forensic document laboratory that refuted the validity of documents submitted by Sy to establish his Mauritanian nationality. The immigration judge granted the motion, terminated the previous grant of asylum,

---

[*]The Hon. William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

reopened the proceedings against Sy, and found him ineligible for asylum. The ruling of the immigration judge was affirmed by the Board of Immigration Appeals (BIA).

Sy raises two issues on petition for review of the immigration judge's determination. First, he argues the INS did not prove by a preponderance of the evidence that he had actual knowledge of the non-authenticity of the documents. Second, Sy argues that the BIA violated his due process rights by affirming his case without the proper record before it. We conclude that the record supports the immigration judge's decision and, therefore, decline to overturn the ruling below.

## FACTUAL AND PROCEDURAL BACKGROUND

When Sy initially came before the immigration court in response to a notice to appear, he conceded his removability and indicated that he would apply for asylum. At the ensuing hearing on the merits of his application, Sy testified that he was born in Teckan, Mauritania. He related details about his education and testified that he was a supporter of Ould Daddah, a reform politician, as well as the Force Liberation African and Mauritania (FLAM), for which he had performed some editorial work. Sy reported that he had been arrested three times. The first was allegedly in October 1998, when he was detained after he organized a protest march against preferential treatment for Beydane students (described as "white moors") at his high school. During this imprisonment, he said, he was questioned and tortured. He further testified that in March 1995, he was stopped by police while driving from Teckan to Nouadhibou and arrested after the officers found a FLAM

newspaper in his car.  According to Sy, his identification card was confiscated, and he was imprisoned for three months, during which time he was beaten.  Sy also testified that in December 1997, he was detained following his participation in a demonstration in favor of Ould Daddah and free elections.  Sy reportedly escaped from custody in April 1998 and fled the country shortly thereafter.

At the hearing, Sy entered two exhibits: a French original and English translation of a Mauritanian nationality certificate (Exhibit 6) and a French original and English translation of a Mauritanian birth certificate excerpt (Exhibit 7).  When questioned about the source of these documents, Sy told the immigration judge that after his initial appearance, he had contacted his sister, who was living in Nouackhott, Mauritania, and asked her to retrieve the documents from his father's house in Teckan. He said that he did not ask his parents to send the documents because his parents are illiterate and would not be able to identify them properly.  The immigration judge admitted these exhibits but postponed cross-examination of Sy in order to give the INS time to submit them for forensic examination.

When the hearing resumed, however, the results from the forensic laboratory were not yet available.  Nevertheless, the INS attorney proceeded with cross-examination of Sy, pointing out some inconsistencies between his application for asylum and his testimony at the previous hearing.  Although some of these inconsistencies could be characterized as minor discrepancies and errors in translation, the questioning did expose Sy's lack of familiarity with the geography of Mauritania in general and of Nouadhibou in particular.

As the record reflects, Nouadhibou is the northwestern-most part of Mauritania. It is located on a peninsula, surrounded on the east, west, and south by water. Half the territory of this peninsula belongs to Western Sahara (under the control of Morocco); the Mauritanian territory comprises the eastern portion of the peninsula. When questioned, however, Sy stated that Nouadhibou is bordered by the Atlantic Ocean on the west. Sy also stated that it was possible to drive directly south from Nouadhibou and reach Nouakchott. (Nouakchott is generally south of Nouadhibou, but Sy did not address the fact that one would first need to go north to get off the peninsula and onto the mainland somehow, before driving in the direction of Nouakchott.) Sy also said that Nouadhibou was bordered on the east by hills, rather than by water.

In fact, the immigration judge noted that Sy gave some answers on cross-examination suggesting that he had never been to Nouadhibou, despite his claim that he had gone to high school there and had been arrested in that city. The judge pressed Sy, asking him to describe what would happen if he started off in downtown Nouadhibou and began walking east, toward the direction in which he routinely prayed. He prompted Sy about whether he would encounter "some kind of natural feature," and Sy answered only, "The airport." Moreover, as pointed out by the INS, when asked to describe what one would encounter when walking due west from downtown Nouadhibou, Sy made no mention of the notorious minefields that lay to the west of Nouadhibou, in Western Sahara.

However, Sy did exhibit some knowledge of Mauritania: he was able to name the different regions of the country, the major cities, and their geographic relation to one another, as well as some of the countries that border Mauritania and the name of Mauritania's first president. Based on this testimony, and without the benefit of forensic analysis of Sy's exhibits, the immigration judge granted Sy's asylum claim. He noted that Sy's testimony was in accord with the State Department's reports on Mauritania, which indicated that the government did not tolerate political opposition and had arrested supporters of Ahmed Ould Daddah and, furthermore, that the government was hostile toward Afro-Mauritanians. The judge described Sy's knowledge of Mauritanian geography as a "mixed bag," but explained:

> In this case, the Court . . . does not wish to deny asylum to a deserving applicant simply because of a poor sense of direction or an ignorance of that country from which the respondent hails. The Court itself might be able to describe east from west but there are other people who may not. More importantly, the Court notes that respondent was able to describe in a general way the geography and relationship of cities in his country and so the Court finds that even if he lacks a poor working knowledge of Nouadhibou, he has at least convinced the Court that he is Mauritanian . . . .

Crediting Sy's testimony, the immigration judge also found that he had demonstrated a well-founded fear of persecution. However, the judge concluded that Sy had failed to demonstrate that it was more likely than not that he would be persecuted if returned to Mauritania. Thus, the immigration judge's order granted Sy's application for asylum but denied his application for withholding of removal and denied relief under the U.N. Convention Against Torture.

When the hearing was reconvened, the immigration judge heard testimony from Larry Ziegler, Senior Forensic Document Examiner with the INS. Ziegler had compared the documents submitted by Sy at the earlier hearing with known exemplars of such Mauritanian documents by using handheld magnification, a stereo microscope, and infrared light. He found that Exhibit 6, the Mauritanian *certificate de nationale*, was produced by a photocopier, rather than an offset printer, as was the known document, which – unlike the exhibit – was printed in French and English on one side and Arabic on the other. No known documents from Mauritania possessed by the laboratory were created on a photocopy machine, and many specifically advised that a photocopy should not be accepted. Regarding Exhibit 7, the birth certificate extract, Ziegler noted:

> [I]t's a short form and it's all type written and again most commercial documents are, the commercial documents that I have seen coming out of Mauritania, are print[ed] either by a letter press or offset process and also . . . the seal on the upper left hand corner is . . . very, very light, it's almost illegible and many, many times . . . intelligence sources say that the reason is that the seal is so illegible is because . . . [it] is a fraudulent seal and gives the appearance of being lightly, lightly stamped, so there were things like that that made me also suspicious but the main thing is that they just don't match what we have on file.

In addition, both documents were marked with a brown stain that had not penetrated into the document fibers, consistent with an attempt to artificially age a document.

Sy presented no expert testimony in rebuttal. Moreover, he gave testimony that conflicted with his earlier explanation of how he came to possess Exhibits 6 and 7. He initially told the judge that his sister retrieved the documents from their parents' house in

Teckan, but at this hearing he stated that she had obtained them from the civil center in

Drakise. He also presented two additional exhibits: a second certificate of nationality

(Exhibit 11) and a birth certificate (Exhibit 12). Both differed significantly from the first set

of documents that Sy submitted.

The immigration judge issued an oral decision at the conclusion of the hearing,

recounting the basis for Ziegler's professional opinion that both documents were fraudulent

and noting that Sy had produced no expert testimony to contradict this conclusion.

Furthermore, the judge found it "significant" that Sy had produced "no attestation or

declaration or affidavit from his sister explaining how she obtained these documents," an

omission that he found especially telling, because Sy submitted another letter from his

sister, unrelated to the documents, that established that Sy had an open channel of

communication with her that he had failed to utilize. The immigration judge also pointed

to the many inconsistencies in Sy's testimony and to the fact that Sy was unable to explain

the substance of the documents:

> Respondent was unable to answer questions put to him by his own attorney
> and by the Court as to the significance of a 1988 date on Exhibit 6.
> Respondent testified that a birth declaration is normally obtained shortly after
> birth in Mauritania, one's parents going to the city hall to attest to the birth of
> the child. And respondent testified, that he was born in 1971, not in 1988.
> Further, there is no notation on Exhibit 6 that a copy was made of a 1988
> document in 1998 or 1999, when his sister supposedly went to get this
> document for him. Respondent was unable to convincingly explain that when
> the Court asked him what this 1988 date meant.

The immigration judge also gave no credence to the additional documents submitted by Sy, given that they were similarly unverified and completely inconsistent with the previously submitted Exhibits 6 and 7. The judge noted on the record, "[O]ne is confronted with documents that look completely different and which actually contain different information with different dates, different type faces, and other dissimilarities obvious even to the Court's untrained and naked eye."

In light of the new evidence, the immigration judge reversed his previous decision, noting that the grant of asylum had been given despite "probing cross-examination by Service counsel and the introduction of documents to suggest that respondent may not have been in Nouadhibou at all in that he did not understand the basic geography of that city." However, in light of the intervening testimony of Ziegler regarding the fraudulence of Sy's submitted documents, and given Sy's "vacillating, weak, and otherwise unclear" explanations, the judge concluded that "[t]here is no reason to give respondent the benefit of the doubt today." Moreover, the court noted direct parallels between Sy's case and *Matter of O-D-*, 21 I&N Dec. 1079 (BIA 1998), in which a claim of Mauritanian nationality was denied based on the proffer of counterfeit documents. As a result, the Immigration judge rescinded the original grant of asylum, denied the renewed application for asylum, and ordered that Sy be removed to Mauritania.

After some initial confusion about the inclusion of the hearing transcript in the record on appeal, the BIA ultimately denied Sy's appeal and rejected his claim that he had

received ineffective assistance of counsel. Sy now seeks review of the final order of removal.

## **DISCUSSION**

The petitioner frames the issue on review as follows: "Whether the determination of the immigration court and the BIA that Petitioner fraudulently obtained asylum through the use of a counterfeit document was supported by substantial evidence when there was no evidence that Petitioner knew that the counterfeit document was not genuine." It is conceivable that if this were an accurate description of the dispositive issue in this case, the question could be answered in the petitioner's favor under *Kourski v. Ashcroft*, 355 F.3d 1038 (7th Cir. 2004), the opinion of the Seventh Circuit that he asserts should control the outcome here. This characterization of the question is, however, not accurate.

In the first place, the petitioner submitted not one, but at least two, counterfeit documents – and possibly several more that were handed in by counsel too late to be examined, even though a postmark on the envelope indicated that they had been in petitioner's possession for some period of time prior to the hearing. Moreover, as the petitioner concedes in his brief on appeal, the standard is not whether he actually *knew* that the documents were fraudulent, but whether – under the circumstances of this case – he knew or *should have known* that they were counterfeit.

- 9 -

This standard better comports with the Seventh Circuit's observation in *Kourski* that "the immigration judge [would have to] find that Kourski knew or *suspected* that the birth certificate [at issue] was a forgery" in order to deny asylum on the basis of fraud. *Id.* at 1039 (emphasis added). But the forged birth certificate in *Kourski* was the only counterfeit document that was submitted, and it was described by the court as "a subtle forgery." *Id.* at 1040. Moreover, in testifying that the paper showing his "nationality" as Jewish had been sent from Russia by his mother, Kourski offered a plausible explanation of how he could have come into possession of the forged certificate in an apparently innocent manner.

Those simply are not the circumstances here. The inference that Sy knew of the inauthenticity of these documents derives not only from their obviously fake appearance, but also from Sy's inability to offer an internally consistent explanation of how he came to possess them. Worse, when confronted with the forensic report, Sy presented a second set of nationality documents, which bore little relation to the first set. This bizarre and unexplained re-submission reads as an evidentiary *mea culpa* of sorts. At the very least, it indicates an unspoken acknowledgment by the petitioner that the first set of documents were inadequate, if not completely unreliable. Furthermore, Sy's lack of knowledge of the critical geography of Mauritania, his murky explanation of how he obtained both sets of documents, the forensic report calling into question the authenticity of the documents, and the lack of corroboration for, and the numerous inconsistencies in his testimony, provided ample support for an adverse credibility finding by the immigration judge.

Our conclusion in this regard is fully supported by circuit precedent.  We held in *Selami v. Gonzales*, for example, that "the submission of a fraudulent document in support of a key element of an asylum claim is sufficient to support an adverse credibility determination" that would, in turn, support the denial of relief.  423 F.3d 621, 625 (6th Cir. 2005).  We noted in *Selami* that the same principle had been upheld in other decisions, citing *Yongo v. INS*, 355 F.3d 27, 33 (1st Cir. 2004), and *Akinmade v. INS*, 196 F.3d 951, 956 (9th Cir. 1999), and quoting from the BIA's opinion in *In re O-D-*, 21 I&N Dec. 1079 (BIA 1998).  In the latter case, involving, as here, an asylum applicant who claimed to be a native and citizen of Mauritania and who proffered counterfeit identity papers, the BIA observed:

> [I]n the context of an asylum adjudication, there may be instances in which a respondent voluntarily and intentionally submits a document into evidence, intending to establish his eligibility for asylum, that is later shown to be counterfeit.  The adjudicator may consider whether that document points to a respondent's lack of credibility regarding the asylum claim.  Ordinarily, it is reasonable to infer that a respondent with a legitimate claim does not usually find it necessary to invent or fabricate documents in order to establish asylum eligibility . . . .
>
> We find that this respondent's presentation of at least one counterfeit document, and probably two, submitted to prove a central element of the claim in an asylum adjudication, indicates his lack of credibility.  We also find that the presentation of such questionable documents, in the absence of an explanation regarding such presentation, creates serious doubts regarding the respondent's overall credibility . . . and diminishes the reliability of his other evidence.

*Id.* at 1083.

We conclude that there is substantial evidence in the record to support the immigration court's decision that the petitioner was not entitled to a finding of credibility, either as to his testimony or to the documentary evidence that he proffered. It follows that the court's order of removal was not entered in error.

Nor do we find any merit to the petitioner's allegation that the BIA's review of the immigration court's decision was inadequate in any respect. We therefore DENY review of the BIA's order affirming the decision of the immigration court.