**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KHAGENDRA KHADKA,
                    *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 05-75726

Agency No.
A096-152-897

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
March 8, 2010—San Francisco, California

Filed August 18, 2010

Before: Cynthia Holcomb Hall, John T. Noonan, Jr., and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas;
Partial Concurrence and Partial Dissent by Judge Hall

**COUNSEL**

Robert B. Jobe, Law Office of Robert B. Jobe, San Francisco, California, for the petitioner.

Peter D. Keisler, Assistant Attorney General, and James E. Grimes, Senior Litigation Counsel, Civil Division; and Erica Miles (argued), Attorney, Office of Immigration Litigation, U.S. Department of Justice, Washington, DC.

**OPINION**

THOMAS, Circuit Judge:

This petition for review presents us with the question of whether an adverse credibility finding by an immigration judge ("IJ") based solely on the IJ's belief that the petitioner created a document for the purpose of supporting an asylum application can sustain a *sua sponte* finding that the petitioner had filed a frivolous petition. Under the circumstances presented by this case, when the possibility of such a finding was not raised by the government or by the IJ, we conclude that the frivolous finding must be set aside. We conclude, however, that the IJ's adverse credibility finding was supported by

substantial evidence. We therefore deny the petition in part and grant it in part.

I

Khagendra Khadka entered the United States on November 6, 2002, on a B-1 visitor visa. He applied for asylum in early December. He claimed that his service in the Nepali police force, and his family's affiliation with and support for the Nepali Student Union and Nepali Congress, exposed him as a target for Maoists. He stated that Maoists had threatened his life, demanded money from his family, and were actively searching for him.[1] Along with his application, Khadka submitted a large amount of documentation of his service in the Nepali police force and UN mission in Iraq, as well as affidavits from family members and a neighbor about threats that he had received. He submitted an article from the *Tarun*, a weekly Nepali newspaper affiliated with the D Faction of the Nepali Congress Party, that reported his activities fighting Maoists and Maoist threats to his life. The asylum officer who interviewed Khadka referred the case to immigration court, and a notice to appear charging him with removability for overstaying his visa was issued one week later.

Khadka renewed his application for asylum. During the hearings held before the IJ, the government argued that the newspaper article was fabricated. The government's primary witness was Stephen Brault, Chief of the Consular Section at the U.S. embassy in Nepal, who testified telephonically about the investigation that he and his associates conducted into the authenticity of the article. Although the editor of the *Tarun* faxed Brault a copy of the article that corresponded to the one submitted by Khadka, people at the embassy were concerned by what they saw as inaccuracies in the article. The embassy

---

[1]The government has not challenged whether Khadka would be legally entitled to asylum if the IJ had found his allegations to be true, and we need not reach that question here.

asked Taranath Dahal, the President of the Federation of Nepal Journalists, to look for the article in the National Press Council archives. Although Dahal found a copy of the September 30, 2002 edition of the *Tarun*, it did not include the article submitted by Khadka. Printed in its place was an article about a woman in a village 18 hours from the Kathmandu Valley. Brault sent a second investigator, who confirmed what the first contact had found. Surprised by what he was being told, Brault himself went to the archives, where he found two copies of the September 30, 2002 *Tarun*, but only a single issue from every other date upon which the *Tarun* had been printed that year. One of the copies contained the article on the village woman, and one contained the article about Khadka. There were no other substantive differences between the two versions. The masthead on the paper with the article about Khadka lacked the D Faction's torch logo (present on the other papers), was the only issue to include a phrase meaning outside the valley, and was printed in monotone rather than two shades. Dahal submitted an affidavit that the *Tarun* published only one version of one issue per week, and Brault agreed, explaining that the embassy's political section had studied every newspaper published in Nepal every day for eleven years. Brault also testified that Khadka's brother-in-law, Bal Bdr. K.C., is a leading member of the D Faction and was a minister in the Nepalese government in September 2002. Brault opined that the outside the valley version was likely printed by the publisher of the *Tarun,* "possibly because of political influence," but never circulated.

On notice before the hearing that the government questioned the authenticity of the article, Khadka called a rebuttal witness, John Adams, a professor at the University of Virginia and regional expert who conducted an investigation of his own. The *Tarun*'s editor told Adams that, up until a year before, the paper had occasionally published a second, outside the valley edition of the paper, in order to control management of its circulation. The editor wanted to get a better sense of the paper's market, which required a way to differentiate

between papers sold in and away from Kathmandu, and he was concerned that sales numbers were being fabricated. Adams had not actually seen any other outside the valley copies of the paper, however; nor did he learn on what dates such editions had been printed.

After several merits hearings, the IJ ultimately found that the article had been published by the newspaper for the sole purpose of assisting Khadka's asylum claim and was not part of the paper circulated publicly. Finding Khadka not credible, the IJ refused to consider any other documents that he submitted.[2] The IJ denied his asylum claim. The IJ also found that Khadka knowingly filed a frivolous asylum application and barred him "forever from receiving any benefits under the Immigration and Nationality Act." The IJ denied Khadka's application for withholding of removal under the INA and the Convention Against Torture, and denied voluntary departure.

On appeal, Khadka challenged the IJ's adverse credibility finding, his denial of asylum, and his finding of frivolousness. The Board of Immigration Appeals (BIA or Board) summarily affirmed. In Khadka's petition for review, he challenges only the IJ's adverse credibility finding and finding of frivolousness.

II

Because the BIA affirmed the IJ's decision without opinion, we review the IJ's decision as the final agency determination. *Kaur v. Gonzales*, 418 F.3d 1061, 1064 (9th Cir. 2005). We review an IJ's credibility determination for substantial evidence. *Id.* We accord special deference to an IJ's credibility determination, and will only exercise our power to grant a petition for review when the evidence " 'compel[s] a con-

---

[2]The IJ's adverse credibility determination was based on approximately seven additional findings, none of which was supported by the evidence, and which, by and large, the government does not defend.

trary conclusion.' " *Id.* (quoting *Malhi v. INS*, 336 F.3d 989, 993 (9th Cir. 2003)) (alteration in *Kaur*). As long as one of the identified grounds underlying a negative credibility finding is supported by substantial evidence and goes to the heart of the claims of persecution, we are bound to accept the negative credibility finding. *See Li v. Ashcroft*, 378 F.3d 959, 964 (9th Cir. 2004) (affirming negative credibility finding even though some of the purported inconsistencies were factually unsupported or irrelevant); *Wang v. INS*, 352 F.3d 1250, 1259 (9th Cir. 2003) ("[W]hether we have rejected some of the IJ's grounds for an adverse credibility finding is irrelevant.").

**[1]** Substantial evidence supports the IJ's adverse credibility determination. Brault testified about an elaborate scheme, involving the publisher of a newspaper associated with Khadka's brother-in-law's political party, to print a non-circulating issue and plant a copy at the National Press Archives.[3] The only explanation that Adams provided the IJ on rebuttal was, in turn, given to him by the implicated publisher and never verified.[4] The alleged fabrication was a specific, cogent reason for the IJ to find Khadka incredible. The article was about Khadka's role fighting Maoist insurgents, their subsequent threats,

---

[3]Khadka argues that the assumption that Khadka's brother-in-law orchestrated the printing of the paper was "speculation and conjecture." We read the IJ's consideration of the brother-in-law's political stature instead as supporting the plausibility of the government's explanation of what happened, rather than a loosely-supported opinion as to how it occurred.

[4]Khadka argues that he was "denied a reasonable opportunity to" respond directly to the IJ's concerns. *See Singh v. Gonzales*, 403 F.3d 1081, 1085 (9th Cir. 2005). We disagree. Khadka was put on notice as to what Brault's testimony would consist of by a previously-submitted affidavit. Khadka did not request a continuance or otherwise indicate that he needed additional time to respond to the government's evolving argument about the article. One day of the merits hearing was held for the sole purpose of discussing the article, and Khadka was given the opportunity to cross examine the government's expert witness and call his own. The IJ was not required to inform Khadka, at the close of evidence, that he still doubted the authenticity of the article.

and the impact of the threats on him and his family. Although the article was by no means the only evidence of his asylum claim, and while it corroborated the other evidence rather than revealing "inconsistencies," it undeniably went to the claim's heart. *See Li*, 378 F.3d at 964. Even if the article was not technically fraudulent, as both parties agree it was actually printed by the publisher of the *Tarun*, it was presented to the immigration court under false pretenses. These false pretenses cast a sufficient pall on the asylum claim that, given our deferential standard of review, the other evidence that Khadka submitted to the court does not compel us to grant the petition.

Although it would have been preferable for the IJ to make a specific finding that Khadka knew about the circumstances of the article's publication, his failure to do so is not enough to support granting his petition. Brault's testimony, combined with Khadka's failure to disclaim the article or provide any explanation for how it came to his possession without him knowing that it was never circulated, supports the conclusion that Khadka was aware of the circumstances of the publication. On appeal, while challenging the finding that he misrepresented the article's history, Khadka still does not claim that he was misled to believe that the article was ever circulated. This is sufficient under our case law. *See Yeimane-Berhe v. Ashcroft*, 393 F.3d 907, 911 (9th Cir. 2004) (holding that an adverse credibility finding based only on the submission of a counterfeit medical document was not supported by the record where there was "no evidence indicating that she knew the document was fraudulent' "); *see also Corovic v. Mukasey*, 519 F.3d 90, 97-98 (2d. Cir. 2008) (where applicant disputes knowledge of fraud, IJ must "evaluate" whether applicant "had reason to know that the documents submitted were fraudulent").

III

**[2]** Pursuant to 8 U.S.C. § 1158(d)(6), "an alien [that] has knowingly made a frivolous application for asylum . . . shall

be permanently ineligible for any benefits under [the INA]." As explained in Department of Homeland Security regulations, section 1158(d)(6) requires the Board or IJ to make a specific finding that an alien "deliberately fabricated" a "material element[ ]" of the application. 8 C.F.R. § 208.20; *see also In re Y-L*, 24 I. & N. Dec. 151, 162 n.1 (BIA 2007) ("In light of the regulatory requirement that there be evidence of a deliberate fabrication of a material element of a claim, the term 'fraudulent' may be more appropriate than the term 'frivolous' when applied to a questionable asylum application."). The IJ or Board must also give the alien "sufficient opportunity to account for any discrepancies or implausible aspects of the claim." 8 C.F.R. § 208.20.

We review a determination that an applicant knowingly made a frivolous application for asylum for compliance with a procedural framework outlined by the BIA. *See Ahir v. Mukasey*, 527 F.3d 912, 917 (9th Cir. 2008) (adopting framework from *Y-L*, *supra*, 24 I. & N. Dec. 151).

> First, an asylum applicant must have notice of the consequences of filing a frivolous application. Second, the IJ or Board must make specific findings that the applicant knowingly filed a frivolous application. Third, those findings must be supported by a preponderance of the evidence. Finally, the applicant must be given sufficient opportunity to account for any discrepancies or implausibilities in his application.

*Id.* (internal citations omitted). Whether a fabrication was of material elements is a mixed question of fact and law. *Y-L*, 24 I. & N. Dec. at 159. Whether the IJ properly applied the regulatory framework is a question of law. *Id.*

**[3]** As is clear from these requirements, " 'a finding of frivolousness does not flow automatically from an adverse credibility determination.' " *Liu v. U.S. Dep't of Justice*, 455 F.3d 106, 113 (2d Cir. 2006) (quoting *Muhanna v. Gonzales*,

399 F.3d 582, 589 (3d Cir. 2005)). For an IJ to make a frivolousness finding, he or she must be convinced that the applicant deliberately fabricated a material element, while an adverse credibility determination merely requires an omission, inconsistency, or discrepancy relating to a material element (the heart of the asylum claim). *Compare* 8 C.F.R. § 208.20, *with Li*, 378 F.3d at 962. Additionally, the government must prove that it is more likely than not that the applicant filed a frivolous asylum application, whereas a negative credibility determination need only be supported by substantial evidence, which might consist of as little as one specific and cogent reason. *Compare Ahir*, 527 F.3d at 917, *with Li*, 378 F.3d at 962, 964; *see also Baria v. Reno*, 94 F.3d 1335, 1340 (9th Cir. 1996) (" 'Substantial evidence' means more than a mere scintilla but less than a preponderance . . . .").[5] Our sister circuits and the BIA have explained that these two differences are due in part to the "severe consequences" that flow from a frivolousness finding. *See Muhanna*, 399 F.3d at 589 (discussing "material element" requirement); *Yang*, 496 F.3d at 274 (same); *Y-L*, 24 I. & N. Dec. at 157 (discussing evidentiary standard).

In this case, the IJ made a specific finding that Khadka knowingly filed a frivolous application.

> The evidence demonstrates that the respondent's statement regarding his alleged special service in the police and army, [where he] encountered terrorists activities against the Maoist insurgents is false, and

---

[5]Although we recognize that the Sixth Circuit held that one fabricated newspaper article was sufficient to support a frivolousness finding, we do not consider the opinion to be persuasive, as it predates *Y-L* and was based on the lower substantial evidence standard. *See Selami v. Gonzales*, 423 F.3d 621, 626-27 (6th Cir. 2005). The fact that the *Selami* court required the frivolousness finding to be based on direct evidence, and that BIA and this circuit permit such a finding to be based on circumstantial evidence, is irrelevant to the unquestionable proposition that substantial evidence is a lower evidentiary standard than a preponderance of the evidence.

his statements regarding specific encounters with the Maoists is also false. He knew that these statements were false. His own employment history shows no such special service or encounters with the Maoists. He claimed that he was threatened by the Maoists and he reported the threats to his superiors at the police department, but they have no record of any such threats [or] any knowledge of any threats or any knowledge that the respondent had any problems with the Maoists whatsoever.

The misrepresented newspaper article was icing on the cake: Khadka "knew" his asylum claim was fabricated, "and yet he submitted his claim along with a newspaper article from his party's partisan press, . . . which is a special edition that was printed specifically to support [the] asylum claim."

Because Khadka's asylum application rests on interactions with Maoists (both as a Striking Commander and thereafter and therefore as an extorted and threatened asylum seeker), if supported by the record, this would constitute a fabrication of a material element of his claim. But the finding is not supported. The government submitted a copy of Khadka's employment records that clearly indicates that he was a Deputy Superintendent of the Nepal Police who was assigned at one point to an anti-terrorist unit, deployed as a striking unit commander in both Chitawan and Pythan provinces, and twice placed in a standby group for a U.N. Peace Keeping Mission.[6] Khadka specifically testified that he had not reported

---

[6]The government focuses on discrepancies between dates on translated employment records presented by Khadka and translated employment records presented by the government. As is clear from other documents on the record, Nepal uses a different calendar system than the United States. As far as we are able to discern from the translated documents, Nepalese and Gregorian dates are approximately fifty-six years, eight months, and two weeks apart, though the exact difference varies from month to month and year to year. Moreover, Nepalese uses non-Arabic numerals, making

any of the threats to his superiors, so it is no wonder that they were unaware of any.[7]

[4] Fabrication of material evidence does not necessarily constitute fabrication of a material element. *Compare* Black's Law Dictionary 638 (9th ed. 2009) (defining "material evidence" as "[e]vidence having some logical connection with the facts of consequence or the issues"), *with id.* at 597 (9th ed. 2009) (defining "element" as "[a] constituent part of a claim that must be proved for the claim to succeed"). The *Tarun* article was not the only evidence Khadka submitted to support his claim that he was threatened by Maoists for his activities as a Nepalese police officer. The record in this case

conversion and translation from a Nepalese date even more difficult to do without error. Nor does the government explain why Khadka might have fabricated dates nearly identical to those in government submitted documents. Given this, it is difficult to see how discrepancies of one day to one week, or even in one case three years, between translated documents submitted by each party, could possibly constitute more than the barest evidence of fraud. This is all the more true here, where Khadka presented a copy of the original Nepalese employment records and the government presented only a translation.

[7]In making his adverse credibility determination, the IJ also concluded that Khadka lied about his encounters with Maoists because Brault had not found any newspaper accounts to confirm any police-Maoist encounters on June 15, 1998 and July 5, 1999. In her dissent, Judge Hall also focuses on the U.S. embassy's lack of evidence of any Maoist encounters on these dates. It is understandable why, based on the translation of the *Tarun* article, Brault, the IJ, and Judge Hall assumed that Khadka claimed to have encountered Maoists on those dates. (Translation: "He had played special role as a striking commander and made great loss to Maoist in Chitwan and Pyuthan district on June 15, 1998 and July 05,1999, when he was Police Inspector."). Without knowing the grammatical structure of written Nepalese, it is only possible to speculate why the dates do not appear next to the words that they modify. But it is clear from his employment history and testimony, if not from the article itself, that those were the dates Khadka had been deployed as a Striking Commander. Thus, Brault's inability to find specific encounters on those dates is not relevant to the question of whether or not Khadka manufactured his claim.

is replete with Nepalese and United Nations employment records, affidavits of friends and family about Maoist threats, and general newspaper articles about Maoists that support the plausibility of Khadka's claim. While these documents do not impact our analysis of the IJ's adverse credibility determination, they undermine the IJ's frivolousness finding, which must be based on evidence indicating that a material element of the claim was actually false.

**[5]** The IJ also erred by not informing Khadka that he was considering making a frivolousness finding or otherwise giving Khadka sufficient opportunity to account for any of the alleged discrepancies and implausibilities in the record other than those few that supported the government's suspicions that the newspaper article was fabricated. *See Ahir*, 527 F.3d at 917. Had he done so, Khadka would have had the opportunity to demonstrate why the petition was not frivolous.

The BIA has clearly contemplated that someone—either the IJ or the government—would raise the issue of fabrication. *See Y-L*, 24 I. & N. Dec. at 159-60 ("[I]t would be a good practice for an Immigration Judge . . . to bring this concern to the attention of the applicant prior to the conclusion of proceedings[, though i]n some cases, the Government may raise the issue of frivolousness . . . ."). Although it was clear in this case that the IJ was suspicious of the authenticity of the newspaper article, it was not until he read his ruling that Khadka was informed that the IJ did not believe that Khadka had ever confronted or been threatened by Maoists. The IJ did not even hint that he was going to reject all of Khadka's documentary evidence. Even if the IJ does not have to inform the applicant that he is considering a frivolousness finding in so many words, where it is not otherwise obvious from the record, he needs to indicate that he questions material *aspects* of the claim. *Cf. Ye v. Dep't of Homeland Security*, 446 F.3d 289, 295-96 (2d Cir. 2006) (finding that for purposes of an adverse credibility determination the respondent need not be

afforded an opportunity to respond to self-evident inconsistencies).

**[6]** The IJ's mistakes in this case highlight the importance of such a warning. With so many of the "facts" underlying the IJ's adverse credibility and frivolousness findings unsupported by the record, it almost certainly would have made a difference to permit Khadka and his attorney to respond to the IJ's concerns. At the very least, Khadka could have attempted to authenticate the supporting documents he presented to the court—many of which came from impartial sources—through some method other than his own testimony.

**[7]** Given proper warning, an asylum applicant may be able to rebut an allegation that he filed a frivolous asylum application without actually convincing a finder of fact that he had not presented fabricated evidence. Because Khadka only was warned that the IJ questioned the authenticity of a single document, "[w]e do not find that . . . the respondent should necessarily have anticipated [the IJ's] finding and provided explanations." *Y-L*, 24 I. & N. Dec. at 160; *see also Yang v. Gonzales*, 496 F.3d 268, 278 (2nd Cir. 2007) (remanding to BIA in part because "the IJ did not inform the petitioner that she was considering a frivolousness finding during the course of the proceedings").

IV

**[8]** The IJ's adverse credibility determination was supported by substantial evidence. However, because the IJ's finding that Khadka filed a frivolous asylum application is not supported by a preponderance of the evidence, and because the IJ's application of the frivolous asylum application bar was procedurally unsound, we grant Khadka's petition in part and reverse the IJ's application of the bar. We remand for further proceedings consistent with this opinion.

**GRANTED IN PART; DENIED IN PART; REMANDED**.

HALL, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the IJ's adverse credibility finding was supported by substantial evidence. I dissent, however, from Section III of the majority opinion, because the IJ properly found that Khadka submitted a frivolous asylum application.

I.

Khadka seeks asylum on the grounds that Maoists in Nepal have threatened him and his family in retaliation for his victories combating Maoist rebels. His asylum application traces Maoist animosity towards him to encounters on June 15, 1998 and July 5, 1999 in the Chitwan and Pyuthan districts, in which Khadka, serving as a striking commander, defeated and killed a number of Maoists. Khadka's primary corroborating evidence for these incidents was an article purportedly published in the *Tarun* newspaper, which reported both these two incidents and the resulting threats to his life. He submitted additional letters from family and friends documenting threats lodged at them by Maoists, but these letters do not identify any specific incidents of Maoist counter-insurgency apart from the June 15, 1998 and July 5, 1999 incidents.

Khadka signed a Form I-589 asylum application, which indicated that the knowing submission of a frivolous asylum application would render him permanently ineligible for relief under the Immigration and Nationality Act. On the same page, Khadka's attorney signed a certification that he had read the application to Khadka in his native language.

On September 30, 2003, the government submitted evidence to the immigration court—including an affidavit from Steven F. Brault, Chief of the Consulate Section of the U.S. Embassy in Kathmandu—indicating that the *Tarun* article had been fabricated. On October 10, 2003, the IJ granted Khadka

a continuance of his merits hearing so that his counsel could conduct his own investigation into the origins of the *Tarun* article. On April 22, 2004, the IJ devoted an entire day's hearing to the authenticity of the *Tarun* article, including testimony from both Brault and Khadka's own expert witness. As the majority sets forth in detail, Brault's testimony demonstrated that the *Tarun* article had been published in a special version of the newspaper for the sole purpose of assisting Khadka's asylum claim. The majority makes only passing reference, however to Brault's testimony that the reported June 15, 1998 and July 5, 1999 Maoists incidents never happened. Brault testified that the U.S. Embassy maintains a comprehensive database of Maoist incidents in Nepal and that there was no evidence of any run-in between police forces and Maoists on or around June 15, 1998 or July 5, 1999. He testified that during the period of 1996-2001, there were very few incidents with Maoist insurgents and that every Maoist incident would have been reported in one of the newspapers used to construct the database. The IJ found, based in large part on Brault's testimony, that Khadka was not credible and had submitted a frivolous asylum application.

## II.

Under 8 U.S.C. § 1158(d)(6), if an asylum applicant knowingly files a frivolous application, he or she is permanently ineligible for immigration benefits. "[A]n asylum application is frivolous if any of its material elements is deliberately fabricated." 8 C.F.R. § 1208.20. Under the four-part test we adopted in *Ahir v. Mukasey*, 527 F.3d 912, 917 (9th Cir. 2008), the majority concludes that the IJ's frivolousness finding was inadequate because (1) Khadka was given insufficient notice that the IJ was considering a frivolousness finding, and (2) fabrication of material *evidence*—here, the *Tarun* article— does not necessarily constitute fabrication of a material *element* of an asylum application. I disagree on both counts.

A.

Khadka had sufficient notice of the consequences of filing a frivolous asylum application and was well aware that the authenticity of the *Tarun* article was at issue. Khadka's Form I-589 asylum application warned that he would be permanently barred from relief under the INA if he filed a frivolous application, and Khadka's attorney signed a certification that Khadka had been read his application in his native language.

The Tenth Circuit has explicitly held that the Form I-589 warning is sufficient notice of the consequences of a frivolous application. *Ribas v. Mukasey*, 545 F.3d 922, 929-30 (10th Cir. 2008). As *Ribas* acknowledges, the governing statute seems to require only written notice of the consequences of a frivolous application. *See* 8 U.S.C. 1158(d)(4)(A) (At the time of filing an application for asylum, the Attorney General shall . . . advise the alien . . . of the consequences . . . of knowingly filing a frivolous application for asylum); 8 U.S.C. 1158(d)(6)(If the Attorney General determines that an alien has knowingly made a frivolous application for asylum *and the alien has received the notice under paragraph (4)(A),* the alien shall be permanently ineligible for any benefits under this chapter) (emphasis added). Although the BIA has stated that it is a "good practice for an Immigration Judge who believes that an applicant may have submitted a frivolous application to bring this concern to the attention of the applicant prior to the conclusion of the proceedings," *In re Y-L*, 24 I. & N. Dec. 151, 159-60, the BIA did not state, nor have we, that an oral, as opposed to written, advisement is absolutely necessary. *See id.* at 160 n.3 ("There may be situations in which the deliberate falsification of material aspect of the asylum claim is so clear on the record that a formal request for an explanation would be a needless exercise.").[1]

---

[1]The *Ahir* decision acknowledged that the warning in Form I-589 might provide sufficient notice of the consequences of filing a frivolous application, but it did not decide the issue. 527 F.3d at 917-18.

Khadka had ample opportunity to address the authenticity of the *Tarun* article, including the underlying "facts" it reported. The IJ granted the parties a series of continuances to investigate the article and obtain expert witnesses, and an entire day's hearing was devoted solely to the topic. At the hearing, there was no indication that Khadka was denied any opportunity to fully develop the testimony of either the government's or his own expert. Khadka was aware that there were serious doubts regarding the veracity and authenticity of the *Tarun* article, had notice of the serious consequences of submitting false evidence, and both parties dedicated substantial time and resources to the genesis of the disputed article.

B.

The majority alternatively argues that Khadka's submission of a fabricated newspaper article was insufficient evidence to support a frivolousness finding. Although the *Tarun* article is material *evidence* of persecution, the majority concludes that Khadka did not falsify a material *element* of his asylum application, given the existence of other corroborating evidence.

The majority provides thin support for distinguishing between "material evidence" and a "material element," and case law does not seem to require such parsing. *In Selami v. Gonzales*, 423 F.3d F.3d 621, 626 (6th Cir. 2005), the Sixth Circuit upheld a finding of frivolousness based upon the submission of fraudulent newspaper article, reasoning that the article "was submitted by Selami to corroborate the core elements of his asylum claim."[2] Even though there may have

---

[2]The majority summarily rejects the *Selami* decision because it predates the BIA's decision in *Y-L* and was based on a lower substantial evidence standard. Maj. Op. at 12135 n.5. I disagree with this reasoning. Our decision in *Ahir* specifically addressed the Sixth Circuit's decision in *Selami*. The *Ahir* panel noted that prior to *Y-L* other circuits upheld frivolousness findings only if an applicant had submitted fraudulent extrinsic evidence or made an explicit admission of untruthfulness. 527 F.3d at 918. The

been other evidence to support Selami's asylum application, the newspaper article went to the heart of his claim and therefore its fabrication was a fabrication of a "material element." Similarly here, Khadka argues that Maoists have targeted him and his family as a result of his counter-insurgency successes, and he introduced the *Tarun* article specifically to corroborate this story. Khadka's submission of a fraudulent newspaper article to corroborate a core element of his claim is sufficient to support a frivolousness finding.

The majority also overstates the significance of the remainder of Khadka's documentary evidence. Although the record is "replete with Nepalese and United Nations employment records" indicating that Khadka was assigned to anti-terrorist units, Maj. Op. at 12138, the fact that he may have held these positions does not demonstrate that he actually had any significant interactions with Maoist rebels. The "affidavits of friends and family about Maoist threats," *id.*; do broadly declare Maoists' desire for retribution against Khadka as well as the purported subjective fears of Khadka's family members, but they similarly lack any persuasive basis for concluding that Khadka had ever in fact "made great loss" against the insurgents as set forth in the *Tarun* article.[3] The many "gen-

---

panel held, however, that the *Y-L* test did not require such a stringent showing, and that a frivolousness finding could be based on both direct and circumstantial evidence. *Id.* Although the Sixth Circuit in *Selami* stated that "the IJ's finding was supported by substantial evidence," 423 F.3d at 626, it actually imposed a evidentiary standard that was more stringent that the standard adopted in *Y-L* and *Ahir*.

[3]Khadka's wife submitted a letter mentioning the June 15, 1998, and the July 5, 1999, incidents, but she specifically references the *Tarun* article, substantially undermining her credibility. Perhaps the strongest documentary evidence is an "appraisal" letter directed to Nepalese police headquarters, relating Khadka's "effective role in order to control the activities of the Maoists in this district." Although the article mentions the arrest of a single Maoist and obtaining some "good intelligence," there is nothing in the article specifying any major combat efforts led by Khadka.

eral newspaper articles about Maoists," *id*., also fail to persuasively support a particularized fear of persecution.

Given the lack of any other documentary evidence of particular encounters with Maoists, it is hard to imagine how the *Tarun* article could be more central to Khadka's asylum application. If the fabrication of the *Tarun* article is insufficient to support a frivolousness finding, it is difficult to imagine how pervasively and egregiously false an asylum application would need to be in order to satisfy the majority's standard.

## III.

For the foregoing reasons, I dissent in part from the majority opinion.