NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0757n.06
Filed: October 24, 2007

No. 06-4179

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LUME PRELDAKAJ, | ) | |
| | ) | |
| **Petitioner,** | ) | **ON PETITION** FOR REVIEW |
| | ) | OF AN ORDER FROM THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| PETER D. KEISLER,* Acting Attorney | ) | |
| General of the United States | ) | |
| | ) | **O P I N I O N** |
| **Respondent.** | ) | |
| | ) | |

Before: MOORE and GRIFFIN, Circuit Judges; TARNOW,** District Judge.

**KAREN NELSON MOORE, Circuit Judge.** The petitioner, an Albanian citizen, petitions this court to review the Board of Immigration Appeals's ("BIA") denial of her claim for asylum and her claims for withholding of removal under the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT"). The BIA concluded that she was not credible on the basis of inconsistences between her application for asylum and her various testimonies. We conclude that the BIA had substantial evidence to support this finding, and we therefore **DENY** the petition for review.

---

*Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Attorney General Peter D. Keisler is automatically substituted for former Attorney General Alberto R. Gonzales.

**The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

# I. BACKGROUND

On August 30, 2000, Lume Preldakaj and her two small children entered the United States after leaving their home in Albania. Joint Appendix ("J.A.") at 179 (Sworn Stmt. of Aug. 30, 2000 at 2). The INS conducted an initial interview after she arrived at Chicago's O'Hare airport without any of the appropriate documents. At this interview, the officer asked Preldakaj several questions about her motivations for traveling to the United States, and Preldakaj's answers were largely economic. For instance, when asked to describe her purpose in entering the United States, she stated: "I have no job. There's no income. I cannot buy food for my kids. I came here for a better life." J.A. at 179 (Stmt. at 2). She also said that she intended to stay only long enough to make enough money to return to Albania and "make a good life." *Id.* She did, however, state that she feared being harmed if she returned to Albania. J.A. at 181 (Stmt. at 4).

The day after her arrival, she had the opportunity to elaborate on those concerns during her credible-fear interview. J.A. at 182 (Credible Fear Worksheet at 1). She claimed that her family was mistreated in Albania and that she feared the Albanian authorities, J.A. at 184 (Worksheet at 3), but when asked for details, her answers had an economic focus. For instance, she said: "I was from a persecuted family. We could not find jobs[.] We weren't allowed to work. I had to come to the United States." J.A. at 188 (Asylum Pre-Screening Interview at 4). She also mentioned that she was fired from her teaching job in 1998. *Id.*

The interviewing officer pressed Preldakaj for information on specific types of abuses. When asked if the Albanian authorities had arrested anyone in her family, she responded: "No one in the last 10 years." J.A. at 189 (Interview at 5). The officer asked whether her husband's affiliation with the Democratic Party caused problems, and she said: "No, but he was threatened by the Socialists.

2

. . . He was threatened before I married him." *Id.* When asked if she was ever threatened or harmed in Albania, she responded: "No." *Id.* She also denied worrying about being tortured in Albania. J.A. at 190 (Interview at 6). Instead, her worries about returning to Albania were more general: "I don't know what will happen. I am afraid. If there is voting soon there will be a war." *Id.*

On March 7, 2003, Preldakaj filed an application for asylum, in which she explained:

I left Albania because my family and I have been continually persecuted by the members of the Albanian Socialist Party due to my husband's beliefs and involvement in the D[e]mocratic P[a]rty. We have been beaten, threatened and persecuted till [sic] we were foced [sic] to flee our own country. My husband (Simon Preldakaj) was arrested on several occasions, severely beaten; our store was shut down, our house was threatened to be exploded; I was fired from my job as a teacher by the socialist agents and party members, only because my husband refused to stop his participation with the democratic party movement . . . .

J.A. at 321 (I-589 at 5). She provided some specifics on her husband's problems, describing three times that he was arrested and beaten, once in 1991, 1997, and 1998. J.A. at 322 (I-589 at 6). She also mentioned that he received threats due to his participation in the 2000 election campaign. *Id.* Because of these events, she feared for the lives of her family members if they returned: "If we return to our own country, my family and I would be killed. . . . If we returned, I am convinced that my daughter are [sic] going to be kidnapped, phisically [sic] harmed, I will be killed and my husband will also be assassinated." J.A. at 321 (I-589 at 5).

On January 28, 2005, the IJ conducted a hearing to assess Preldakaj's claims. Preldakaj elaborated on some of the statements that she had made previously. For instance, Preldakaj described the circumstances under which she was fired from her teaching job and suggested that it was politically motivated. *See* J.A. at 123 (Jan. 28, 2005 Hr'g Tr. at 43:7-23). She also described

3

her husband's arrests in 1997 and 1998 and the accompanying beating. J.A. at 124-26 (Tr. at 44:1-46:9).

In the hearing Preldakaj also mentioned some incidents that she had previously not discussed. For example, she described how Socialists interrupted her teaching to threaten her. J.A. at 118 (Tr. at 38:19-24). She also testified that a few weeks later, people remarking about her affiliation with the Democratic Party broke items in her store, J.A. at 121 (Tr. at 41:14-21), called her a bitch, J.A. at 122 (Tr. at 42:9-10), and threw her out of the store and onto the ground where she hit her head on broken glass. *Id*. (Tr. at 42:18-23). She also described an incident on August 25, 2000, during which three officers entered her home, grabbed her coat, and asked "where is the enemy" as they searched the house for her husband. J.A. at 126 (Tr. at 46:12-25). To Preldakaj, these events were "terrors," J.A. at 131 (Tr. at 51:21-23), and she did not want to return to Albania out of fear of being killed. J.A. at 133 (Tr. at 53:19-21).

On cross-examination, the government challenged Preldakaj on the previously undisclosed events. When asked why she did not mention the school harassment in her application, she said "I did not know what to leave out and [what] to put in . . . . Maybe I did not review it very well." J.A. at 136-37 (Tr. at 56:13-57:2). When asked why she did not mention the August 25, 2000 incident, she said it was because she thought it was going to be in her husband's application. J.A. at 138 (Tr. at 58:1-3). She also claimed that she did not initially mention many of these events because she was afraid to tell the information to immigration officials, J.A. at 144 (Tr. at 64:10-11), and because she was "very sad in those days." *Id.* (Tr. at 64:25).

When the government pushed her on the parts of her story that had changed, Preldakaj sometimes offered a reason. *See* J.A. at 139 (Tr. at 59:19-22) ("I was very stressed out and my youngest child had not been eating or drinking anything for three days and he was crying."). More

often than not, however, she could not explain the discrepancies. Frequently, her response was "I don't know" or "I don't remember." *See, e.g.*, J.A. at 141 (Tr. at 61:16, 61:21, 61:25); J.A. at 142 (Tr. at 62:13, 62:20).

On February 15, 2005, the IJ denied Preldakaj's applications for asylum and withholding of removal. The IJ did not even consider the asylum claim, declaring it time-barred. J.A. at 62 (Dec. and Order at 2 n.2). As the first step in considering Preldakaj's withholding claims, the IJ evaluated Preldakaj's credibility. J.A. at 67 (Order at 7). The IJ found that "substantially important components of [Preldakaj's] oral testimony substantially differ from her sworn declaration, her I-589 Application, and her Credible Fear Interview." J.A. at 67-68 (Order at 7-8). Thus, the IJ concluded that Preldakaj could not establish eligibility for withholding of removal. J.A. at 71 (Order at 11).

On August 2, 2006, the BIA ruled on Preldakaj's appeal from the IJ's decision. J.A. at 2 (BIA Dec. at 1). Although the IJ did not even hear the asylum claim, the BIA decided that "[f]or the purposes of appeal, we will assume that extraordinary circumstances prevented [Preldakaj] from filing a timely application . . . . As such, we will also assume that the Immigration Judge erred in not considering her asylum application." J.A. at 3 (Dec. at 2) (internal citations omitted). The BIA next evaluated Preldakaj's credibility and found her to be not credible based on "material inconsistencies" that the IJ identified:

1.  In her asylum application Preldakaj said that Socialist Party members had beaten and threatened her, but she did not mention these in her testimony.

2.  Preldakaj testified that "officers searched her home and grabbed her collar," but she did not mention that in her application.

3.  Preldakaj testified that her husband was arrested twice, but in her credible-fear interview she said no one had been arrested in ten years.

5

4. Preldakaj testified that she had been threatened in her class and her grocery store but did not mention these in her credible-fear interview.

5. Preldakaj had initially told immigration officers that she was entering the United States for economic reasons, but she later testified that she was fleeing political persecution.

*Id*. The BIA concluded that "[t]hese inconsistencies go to the heart of [Preldakaj's] claim that she was persecuted in her native country on account of her political opinion." *Id*. Because Preldakaj was not credible, the BIA concluded that she had not met her burden of proof for either her asylum application or her withholding of removal claims; the BIA ordered Preldakaj removed to Albania.

## II. THE BIA'S REVIEW OF THE ASYLUM APPLICATION

### A. Standard of Review

When we review a final order of removal, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We review "factual findings under the substantial evidence standard." *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005). Under that standard, "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (requiring that the evidence "compel" an alternate conclusion before reversing the BIA); *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) ("[T]he petitioner must show that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution.").

The trier of fact can base a credibility determination on "all relevant factors" including the applicant's demeanor and the consistency and plausibility of the various statements. *See* 8 U.S.C.

§ 1158(b)(1)(B)(iii); 8 U.S.C. § 1229a(c)(4)(C) (applying the same credibility test to statements made in a removal proceeding). "Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard. This is a deferential standard: A reviewing court should not reverse simply because it is convinced that it would have decided the case differently." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004) (internal quotation marks and citation omitted); *see also Mapouya v. Gonzales*, 487 F.3d 396, 405-06 (6th Cir. 2007); *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006). "While an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons. An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They cannot be based on an irrelevant inconsistency." *Sylla*, 388 F.3d at 926; *see also Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005).

## B. The BIA's Credibility Determination

When the BIA does more than adopt the decision of the IJ, "our review is limited to the actions taken by the BIA." *Selami v. Gonzales*, 423 F.3d 621, 624 (6th Cir. 2005); *see also Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006) (reviewing the BIA's superseding decision, not that of the IJ); *Ouda*, 324 F.3d at 453-54 (reviewing the BIA's superseding decision, not that of the IJ). Although the IJ did not rule on the merits of the asylum application, the BIA did, and because the BIA did more than summarily accept the IJ's opinion, we review the BIA's decision.

In order to qualify for asylum, an applicant must pass a "two-step inquiry: first, whether the petitioner is a 'refugee' . . . and second, whether the petitioner merits a favorable exercise of discretion by the IJ." *Mapouya*, 487 F.3d at 406. "The burden of proof is on the applicant to establish that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(i). A refugee is one "who is unable or unwilling to return to" his country "because of persecution or a well-founded fear of

7

persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

In order to establish refugee status, the applicant must demonstrate either past persecution or a well-founded fear of future persecution. 8 C.F.R. § 208.13(b). While establishing past persecution requires that an applicant show "'more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty,'" *Ouda*, 324 F.3d at 452 (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998)), in order to show a well-founded fear of persecution the applicant does not need to establish that his government is more likely than not to persecute him. *Perkovic v. INS*, 33 F.3d 615, 621 (6th Cir. 1994) ("A well-founded fear of persecution does not require the applicant to show that he probably will be persecuted if he is deported; '[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." (alteration in original) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987))); *see also Selami*, 423 F.3d at 625.

In order to establish past persecution or a well-founded fear of persecution, the testimony of the applicant may be sufficient, but only if the trier of fact finds the testimony credible. *See* 8 U.S.C. § 1158(b)(1)(B)(ii); *Perkovic*, 33 F.3d at 621 (noting that testimony is sufficient if the testimony is "believable, consistent, and sufficiently detailed"). In this case, the IJ made a determination, in the context of Preldakaj's withholding of removal claims, that Preldakaj was not credible. J.A. at 67-68 (Order at 7-8). The BIA can review the IJ's findings of fact, including credibility determinations, only for clear error. 8 C.F.R. § 1003.1(d)(3)(i). As the comments for the regulation explain: "Immigration judges are better positioned to discern credibility and assess the facts with the

8

witnesses before them . . . ." Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54878, 54890 (proposed Aug. 26, 2002). Although the BIA did not explicitly describe its level of review, we conclude from the text of its opinion that the BIA engaged in the appropriate review for clear error. *See* J.A. at 3 (Dec. at 2) (evaluating the IJ's opinion and concluding that the inconsistencies "are sufficient to support the adverse credibility determination").

The BIA, after accepting the IJ's determination that Preldakaj was not credible, applied that finding to the applicant's asylum application. Even though the IJ did not make the credibility determination in the context of Preldakaj's asylum application, the standards for determining credibility are identical for both asylum and withholding of removal. 8 U.S.C. § 1231(b)(3)(C) (directing in the statute that governs withholding of removal that "[i]n determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in [the statute], the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of section 1158(b)(1)(B)," which is the section governing asylum). Thus, the IJ's determination of lack of credibility was equally applicable to Preldakaj's asylum application.

Accordingly, we review the BIA's determination of lack of credibility under the substantial-evidence standard. Preldakaj claims that the BIA found her not credible on the basis of "minor inconsistencies that do not go to the heart of the claim." Pet. Br. at 26. We disagree. While it is true that "irrelevant inconsistencies cannot constitute the basis for an adverse credibility determination," *Sylla*, 388 F.3d at 926, discrepancies may be relevant if they can "be viewed as attempts by the applicant to enhance his claims of persecution." *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir.

2004) (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)). We agree with the BIA that Preldakaj's increasingly dramatic story goes to the heart of her claim.

Preldakaj's story changed quite significantly over the course of four and a half years, and the story changed in ways that would seemingly make her application more compelling. For example, there are seven important elements of her story that appeared only after she first explained her entry into the country: (1) her husband's 1991 arrest; (2) Socialists harassed her in her kindergarten class; (3) she was fired from her teaching job; (4) Socialists threatened to blow up her house; (5) she expected to be killed if she returned to Albania; (6) Socialists threw her from her store and injured her; and (7) officers entered her home and searched for her husband. Of these seven elements, none were mentioned in her sworn statement made upon entering the country on August 30, 2000. *See* J.A. at 178-81 (Stmt. at 1-4). One day later, she mentioned only that she was fired from her teaching job. J.A. at 188 (Interview at 4). Two and a half years later, in her asylum application, she mentioned an additional three incidents. J.A. at 321 (I-589 at 5) (mentioning her fear of being killed upon returning to Albania and how the Socialists threatened to blow up her house); J.A. at 322 (I-589 at 6) (mentioning her husband's 1991 arrest). And two years after that, in her hearing, she raised five of the seven elements, three of which had never been mentioned before. J.A. at 118 (Tr. at 38:19-24) (describing for the first time how officers harassed her in her class); J.A. at 121-22 (Tr. at 41:9-42:23) (mentioning for the first time how she was thrown from her store); J.A. at 123 (Tr. at 43:7-13) (mentioning how she was fired from her job); J.A. at 126-27 (Tr. at 46:12-47:25) (describing for the first time how officers entered her house); J.A. at 133 (Tr. at 53:19-23) (expressing the conviction that she would be killed if she returned to Albania).

While it is possible that Preldakaj can explain some of the evolution of her story, the partial explanations cannot overcome the substantiality of her story's development. For instance, perhaps it is true that she did not initially discuss her husband's 1991 arrest because she married him in 1994 and did not know about the earlier arrest. J.A. at 187 (Interview at 3). This would not, however, explain why she failed to mention initially several other elements of her story. Similarly, perhaps some of the discrepancies are attributable to language and translation barriers. *See Mapouya*, 487 F.3d at 407 (finding inconsistencies attributable to an apparent "translation misunderstanding"); *Chen*, 447 F.3d at 474-76 (concluding that an IJ erred in finding the applicant incredible because the testimony was largely consistent and credible despite some mistakes and omissions). Ultimately, even if these possible explanations mitigate some of her inconsistencies, her story changed so substantially that we cannot conclude that the evidence compels an alternate conclusion from the BIA's finding that Preldakaj was not credible.[1] *See Saliko v. Gonzales*, 207 F. App'x 570, 575 (6th Cir. 2006) (unpublished) (dismissing a petition where the testimony had discrepancies "too pervasive to ignore").

---

[1]Preldakaj claims that the "IJ erred in finding changed country conditions." Pet. Br. at 30. Preldakaj incorrectly focuses on the IJ's decision and not the BIA's decision, which is the subject of our review. Furthermore, we conclude that Preldakaj misreads the IJ's opinion on this point; the IJ did not make a finding of changed country conditions in Albania but instead simply buttressed the credibility determination with the conclusion that Preldakaj's testimony was "inconsistent with the Country Condition Reports released by the State Department." J.A at 70 (Order at 10). The IJ was very clear as to the purpose in considering the reports: "While these contradictions are not dispositive of the issue, they only lend additional weight to this court's determination that [Preldakaj] is not credible." J.A. at 71 (Order at 11).

### III. PRELDAKAJ'S WITHHOLDING CLAIMS

#### A. Standard of Review

When we review a denial of withholding of removal under the INA, "[t]he standard of review requires us to uphold the BIA's determination against withholding the removal of an alien, unless it is 'manifestly contrary to the law.' Furthermore, any administrative findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003) (quoting *Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001)). The same standard applies to claims for withholding of removal under the CAT. *Almuhtaseb*, 453 F.3d at 749 ("We review the BIA's decision on a request for withholding of removal under the same standard regardless of whether the request was made pursuant to the INA or the CAT."); *Castellano-Chacon*, 341 F.3d at 552.

#### B. The BIA's Determination

Preldakaj claims that the IJ applied the incorrect legal test to her withholding of removal claims. Pet. Br. at 27-28. As already stated, because the BIA did more than simply adopt the IJ's opinion, we limit our review to the BIA's decision. We conclude that the BIA correctly determined that failure to meet the qualifications for asylum precludes meeting the more difficult standards for withholding of removal. J.A. at 3 (Dec. at 2) ("[T]he respondent has necessarily failed to meet the burden of proof for asylum and the *higher burden* for withholding of removal." (emphasis added)).

In order to qualify for withholding of removal under the INA, the applicant must "establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b). The applicant can establish eligibility for withholding of removal by showing either

12

past persecution, § 208.16(b)(1)(i), or that "it is more likely than not that he or she would be persecuted" upon removal to the proposed country. § 208.16(b)(2). Similarly, to demonstrate eligibility for withholding under the CAT, the applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." § 208.16(c)(2).

Because we have already concluded that the BIA had substantial evidence to support its conclusion that Preldakaj was not credible and thus Preldakaj failed to sustain her burden of proof for asylum, our precedent necessitates the conclusion that she cannot carry the tougher burden for withholding of removal. *Selami*, 423 F.3d at 627 n.2 ("Because Selami failed to establish his eligibility for asylum, 'it therefore follows that he cannot satisfy the more stringent standard for withholding of [removal]' as well." (alteration in original) (quoting *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001))); *Liti*, 411 F.3d at 640-41.

Accordingly, the BIA's conclusion that Preldakaj failed to prove eligibility for withholding of removal was not manifestly contrary to law.

## IV. PETITIONER'S TIMELINESS CONCERNS

Preldakaj presents three reasons in support of her request that we overturn the IJ's determination that her asylum claim was time barred. First, Preldakaj claims that the IJ did not use an approved translator at the initial hearing at which she appeared pro se and used a relative as a translator, and that Preldakaj was thereby harmed when the IJ did not inform her of the one-year window in which an applicant must file an asylum application. Pet. Br. at 24. Second, Preldakaj claims that the IJ knew that she wanted to file for asylum but scheduled the hearing after the one-year deadline, thus depriving her of the opportunity to file in a timely manner. Pet. Br. at 24-25. Third, Preldakaj claims that she could have made a timely application had the IJ joined her husband, Simon

13

Preldakaj, into her case because her husband arrived in the United States several months after she did. Pet. Br. at 25.

We need not address these claims. For the purposes of appeal, the BIA assumed that the "Immigration Judge erred in not considering her asylum application." J.A. at 3 (Dec. at 2). Because the BIA considered the merits of the asylum application, these assertions about the IJ's denial of the asylum application are not properly the subject of our review.

That said, we note with some concern the circumstances surrounding the handling of Simon Preldakaj's asylum application. After Lume Preldakaj realized that the one-year period for her asylum application had elapsed, she attempted to join her husband to her case because he had arrived in the United States after she did, and his one-year window had not yet closed. J.A. at 86 (Oct. 19, 2001 Hr'g Tr. at 10:4-10). On November 17, 2001, within the one-year limit, her husband Simon filed an application for asylum. J.A. at 245 (I-589 at 1). Simon's application was rejected because the INS believed that Simon needed to file his application with the Immigration Court. J.A. at 244 (App. Notice at 2). The IJ, however, would not accept Simon's application "because he's not in proceedings." J.A. at 101 (Feb. 7, 2003 Hr'g Tr. at 23:7-8; 23:18-19). There were numerous attempts to join Simon in Preldakaj's proceedings but, for some unknown reason, these attempts failed. *See* J.A. at 91 (Undated Hr'g Tr. at 14:12-14) ("The Court does not want to wait the uncertainty of [Preldakaj's] husband being placed in removal proceedings to proceed with these proceedings."); J.A. at 99 (Feb. 7, 2003 Hr'g Tr. at 21:18-22) ("I've talked to District Counsel and tried to get him NTA'd so we can get him an A number, he doesn't even have an A number, so we can combine these cases and we don't have to waste the Court's time doing separate cases."). Ultimately, the IJ gave up on waiting to resolve the issues with Simon and decided to proceed on

14

Preldakaj's claims. J.A. at 101 (Feb. 7, 2003 Hr'g Tr. at 23:7-19) ("If she has a claim based on her husband's fear, then she can independently establish that claim.").

It seems clear that had the government approved Simon's application, Preldakaj would have received asylum under statutory derivative rights. 8 U.S.C. § 1158(b)(3)(A) ("A spouse . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien . . . ."). Some courts have even suggested that there is standing to sue to obtain those derivative rights. *See Nasr v. Ashcroft*, 113 F. App'x 429, 430-31 (3d Cir. 2004) (assuming without deciding that one spouse may petition for review of the denial of the other spouse's asylum application). Therefore, Preldakaj may possibly have enforceable rights under her husband's application.

Although we are concerned that the little information we have regarding Simon's application suggests serious mistakes on the part of the government that will have profound effects on his family's ability to remain in the United States, the potential mishandling of Simon's application is not the subject of our review. Besides, if Simon's application for asylum is eventually approved, Preldakaj and her children could be granted asylum derivatively, even if they are located outside the United States. 8 C.F.R. § 208.21(d) (2007). Any rights that Preldakaj may have with respect to her husband's application arise under his application, and because his application is not before this court we do not express any conclusions regarding its handling.

## V. CONCLUSION

The BIA had substantial evidence to conclude that Preldakaj was not credible. Thus, the BIA was not in error when it refused her asylum application on the merits and denied withholding of

15

removal under the INA and the CAT. We therefore **DENY** the petition for review of the BIA's decision.